UNITED STATES v. DANKER & MARSTON (No. 731).[1]

1. "CRUDE" ARTICLE.

Though an article may have been processed, if, as a matter of fact, it must be subjected to some additional process to fit it for its chief or only use, it is, so far as that use is concerned, a crude article.—Roessler & Hasslacher Chemical Co. v. United States (94 Fed. Rep., 822).

2. GUM TRAGASOL.

Gum tragasol is an article in a "crude" state used in dyeing; it is not a vegetable extract for dyeing, coloring, staining, or tanning. It was free of duty under paragraph 482, tariff act of 1897, and is free of duty under paragraph 499, tariff act of 1909.

United States Court of Customs Appeals, February 1, 1912.

APPEAL from Board of United States General Appraisers, G. A. 7255 (T. D. 31798).

[Affirmed.]

*Wm. L. Wemple*, Assistant Attorney General (*Chas. D. Lawrence* on the brief), for the United States.

*Searle & Pillsbury* (*Wm. E. Waterhouse* of counsel) for appellees.

Before MONTGOMERY, SMITH, BARBER, and MARTIN, Judges.

SMITH, Judge, delivered the opinion of the court:

This appeal involves the classification of a commodity imported at Boston, Mass., and known as gum tragasol. Some of the gum was imported under the tariff act of 1897 and some of it under the tariff act of 1909. The collector of customs rated the product as a nonenumerated manufactured article and accordingly the importations were assessed for duty at 20 per cent ad valorem either under the provisions of section 6 of the act of 1897 or under the provisions of paragraph 480 of the act of 1909 as the date of importation might require. With the exception that the word "section" is substituted for the word "act" paragraph 480 is a reenactment of section 6, and the particular part of the section and paragraph pertinent to the case is as follows:

* * * There shall be levied, collected, and paid * * * on all articles manufactured, in whole or in part, not provided for, * * * a duty of twenty per centum ad valorem.

The importers protested that the merchandise was not dutiable as an unenumerated manufactured article not provided for, and, among other grounds of objection to the collector's classification, it was averred that gum tragasol was entitled to free entry whether imported under the tariff act of 1897 or under that of 1909. This claim was based on the following language of paragraph 482 of the free list of the tariff act of 1897, which was reenacted in paragraph 499 of the free list of the tariff act of 1909:

Articles in a crude state used in dyeing or tanning not specially provided for. * * *

---

[1] Reported in T. D. 32251 (22 Treas. Dec., 241).

The board sustained the protest on the ground that the goods were entitled to admission free of duty and the Government appealed.

Tragasol is a gum extracted by patented processes from the locust bean, sometimes known as St. John's bread. The patents are owned by the Gum Tragasol Supply Co. (Ltd.), of Hooton, England, and it seems to be conceded that the entire output of the commodity under consideration is manufactured by that concern. From the testimony in the case and the patents in evidence we gather that the locust beans are separated from the pods and then after being submitted to a boiling and soaking process are, after drying, put through decorticating machines in order to free the cotyledons from the husks and germs. The husked cotyledons are next placed in vats where, steeped in water, they are reduced to a pulp, which is slowly raised to a temperature of 180°. After cooking the pulp for two hours or more the gum therein separates itself from the vegetable substances involving it, and, with the water which violent agitation has forced it to absorb, is withdrawn and filtered into a pool, where it is treated with formalin, carbolic acid, or some other chemical for the purpose of preserving the product from deterioration. The article thus processed is known as gum tragasol and constitutes the merchandise imported. In the making of tragasol it appears that great care must be taken to thoroughly husk the beans in order that the pigment carried by the envelope inclosing the cotyledons may not discolor the gum when extracted. If the husks are not completely removed, then it seems that at some stage of the subsequent proceedings the materials must be treated with an appropriate chemical so as to render the pigment insoluble, and thus permit of the withdrawal of the gum as a colorless liquid. Gum tragasol is principally used in the dyeing of textiles, in which industry it serves the purpose of a carrying medium to convey the color into the body of the material to be dyed. Due to the fact that tragasol prepared for use in dyeing is more than 99 per cent water and contains less than 1 per cent of solid matter, colors carried by it penetrate the fabric readily and evenly and are characterized by a transparency which seems to be especially desirable in dyeing woven goods of a lustrous texture.

On this state of facts the Government asks for a reversal, first, because the importation is not an article in a crude state and therefore not dutiable as claimed by the importers; second, because it is dutiable as assessed; and, third, because the tragasol imported since August 5, 1909, if not dutiable as assessed, is dutiable as a vegetable extract used in dyeing under the provisions of paragraph 22 of the tariff act of 1909, which paragraph, in so far as it is pertinent to the issue, is as follows:

22. * * * All extracts of vegetable origin suitable for dyeing, coloring, staining or tanning, * * * and not specially provided for in this section, fifteen per centum ad valorem.

Counsel for the appellant contends that the merchandise the classification of which is in controversy is the resultant product of careful and elaborate processes of manufacture; that once evolved it is so finished and complete that it is ready for use without any refinement or alteration in its essential form and character, and that therefore it can not be considered as "crude," inasmuch as that term carries with it the idea of something in a natural or raw state—something which has not been processed or prepared—something which has not been manufactured or if manufactured not refined. The trouble with this argument is that we are not willing to subscribe to the definition of "crude," upon which it is based. For the purposes of this case it may be conceded that things which are in a natural or a raw state, which are not processed or prepared, which are not manufactured or if manufactured not refined, are in fact generally regarded as crude articles, but from that it does not follow that no article is in a crude state which has gone beyond its natural or raw state or which has been processed, prepared, or manufactured. Indeed an article may be evolved as the result of a series of processes and manufacturing operations and still continue to be an article in a crude state. United States v. Continental Color & Chemical Co. (2 Ct. Cust. Appls., 165; T. D. 31679); in the matter of Leggett (T. D. 21804). As applied to materials crudeness is a relative term, and to determine whether or not a thing is crude for industrial purposes some account must be taken of its intended use. However much a thing may be processed, if, as a matter of fact, it must go through some additional process of substantial preparation or manufacture in order to fit it for its chief or only use, it is, so far as that use is concerned, a crude article. Roessler & Hasslacher Chemical Co. v. United States (94 Fed. Rep., 822); Leber & Meyer v. United States (135 Fed. Rep., 243). That it was not the intention of Congress to put a meaning upon the term "crude" which would confine crude articles to those which were raw, unprepared, unmanufactured, or in a natural state, is evidenced by the fact that many articles clearly manufactured are enumerated as crude articles in one or both of the tariff acts here under consideration; as, for instance, aluminum, argols, camphor, glycerin, iodine, and sago. The fact therefore that gum tragasol has been produced as the result of elaborate manufacturing processes is not of and by itself sufficient to take it out of the category of crude articles used in dyeing, and whatever may have been the systematic operations required to produce it, it must still be regarded as a crude article so far as dyeing is concerned, unless such operations have brought it to such a degree of completion that it is fit to be used for that purpose without further substantial manipulation or manufacture. As shown by the evidence, gum tragasol comes to this country in the form first assumed by it as a distinct entity after its definite separa-

tion from the substances with which it was originally combined and just as it is turned out of the manufacturing establishment. In that form, however, it is not fit for use in dyeing and requires very substantial treatment with proper machinery before it becomes available for use as a carrier of dyes and colors. The evidence shows that the tragasol as imported must take up from five to eight times its bulk in water before it can be used for the purposes of the dyer and that to oblige this material, which is already 96 per cent water, to take up an additional quantity requires agitation in a special machine equipped with revolving beaters capable of a speed of from 80 to 100 revolutions per minute. From this it is clear that the gum tragasol here under consideration can not be applied to its chief use without being subjected to further substantial elaboration and preparation, and that therefore it is an article in a crude state within the decisions of the courts which have heretofore considered the meaning of the term "crude" as employed in tariff laws. In United States *v.* Merck (66 Fed. Rep., 251), the Circuit Court of Appeals, Shipman, Judge, had occasion to consider the nature and character of a sediment precipitated from the juice of a fruit resembling the cucumber in appearance. It appeared that this sediment or precipitate was dried and imported in the form of little cakes under the name of "elaterium." The Government claimed that elaterium was either a medicinal preparation or a drug advanced in value or condition. Inasmuch as it was shown that elaterium was not used by physicians as a medicine, but by the manufacturer as material from which a medicine was made, the court held the preparation to be a crude drug. In Cowl *v.* United States (124 Fed. Rep., 475), a substance known as "guarana" was classified by the collector as a medicinal preparation. It was claimed by the importers to be a crude drug. It appeared from the record in that case that guarana was prepared by shelling the seeds of the *Paullinia sorbilis,* moistening them in water, removing a papery film over the kernel, and pounding them in a mortar until they were reduced to a semisolid consistency. The article was then made up into the form of rolls, wrapped in leaves, and dried in the sun or by the fire. Guarana in that state was in its crudest form, and before being used as a medicine it was either reduced to a powder or from it was distilled an elixir after removing the leaves and other impurities. The board held that the importation was a medicinal preparation, and the circuit court on the authority of United States *v.* Merck, *supra,* sustained the contention of the importer that it was a crude drug. In United States *v.* Continental Color & Chemical Co., *supra,* this court considered the tariff classification of hydroxide of chrome, which is secured as a precipitate by treating with oxide of magnesium a liquid by-product resulting from the manufacture of anthraquinone. The collector assessed the importation as a chemical

compound, and the importers claimed that it was entitled to free entry as an article in a crude state used in tanning and dyeing. The court held that as the hydroxide of chrome was not in a condition fit for use in tanning or dyeing and required treatment with sulphuric acid for tanning purposes and with acetic acid for dyeing purposes it was an article in a crude state within the meaning of paragraph 482 of the tariff act of 1897 and paragraph 499 of the tariff act of 1909.

Whether the gum tragasol imported subsequent to the going into effect of the tariff act of 1909 is more specifically provided for in paragraph 22 of that act is the only question which remains to be determined, and the determination of that question depends upon the meaning which should be given to that particular part of the paragraph which makes provision for "all extracts of vegetable origin suitable for dyeing, coloring, staining, or tanning." We think this provision was not intended by Congress to cover auxiliary agents in dyeing, coloring, staining, or tanning, but only those agencies of vegetable origin which were themselves capable either of imparting color to other substances or of converting hides and skins into leather. Gum tragasol is not such an agency. It is not a dyestuff or coloring matter; neither has it any of the tannic qualities which would entitle it to be classed as a material for tanning.

From all of which we conclude that the merchandise imported is an article in a crude state used in dyeing; that it is not a vegetable extract for dyeing, coloring, staining, or tanning, and that therefore the decision of the Board of General Appraisers should be *affirmed*.

DE VRIES, Judge, did not sit in this case.