NEWHALL & CO. *et al. v.* UNITED STATES (No. 911).[1]

1. SUBLIMATION OF SULPHUR.

Sublimation of sulphur is the artificial distillation thereof, in the course of which the sulphur content of the article distilled is, after evaporation, deposited, collected, and formed according to the commercial or other uses for which it may be designed.

2. CRUDE COMMODITIES.

"Crude" refers commonly to substances or articles in a condition unfit for the ultimate purpose or use for which they are intended.

3. BUNGO SULPHUR NOT REFINED OR CRUDE.

The sulphur of the importation is from Japan. It is expelled by volcanic force from geysers, is drawn off in conduits, and when cooled is broken into various shapes and placed in sacks for transportation. This sulphur, very nearly pure, can not be said to have been refined; nor is it crude. It falls appropriately within the free entry paragraphs of the acts of 1897 and 1909, as sulphur not otherwise provided for.

United States Court of Customs Appeals, May 6, 1913.

APPEAL from Board of United States General Appraisers, G. A. 7351 (T. D. 32420).

[Reversed.]

*William Hayward* for appellants.

*William L. Wemple,* Assistant Attorney General *(Charles E. McNabb,* assistant attorney, of counsel), for the United States.

Before MONTGOMERY, SMITH, BARBER, DE VRIES, and MARTIN, Judges.

BARBER, Judge, delivered the opinion of the court:

This case involves the dutiability of sulphur imported from Japan in 1908, 1909, and 1910. It was assessed for duty by the collector, and the Government here claims the same to be dutiable under paragraph 84 of the tariff act of 1897 and paragraph 81 of the tariff act of 1909, *the material parts of which are identical and read as follows:*

Sulphur, refined or sublimed, or flowers of. * * *.

A duty of $8 per ton was imposed by the earlier and $4 per ton by the later act.

The importers, and there are several in this case, claim the merchandise to be entitled to free entry under paragraph 674 of the

---

[1] Reported in T. D. 33410 (24 Treas. Dec., 688).

act of 1897 and paragraph 686 of the act of 1909, which are identical and read as follows:

Sulphur, lac or precipitated, and sulphur or brimstone, crude, in bulk, sulphur ore as pyrites, or sulphuret of iron in its natural state, containing in excess of twenty-five per centum of sulphur, and sulphur not otherwise provided for in this section.

The Board of General Appraisers overruled the protests.

There appears to be no controversy as to the manner of obtaining this sulphur, which in substance is as follows, as stated by a Government witness:

In Bungo Province, Japan, there are many geyserlike craters which intermittently emit sulphurous gases, fumes, or vapors, and whose action is produced by volcanic activity. During their inactive periods the Japanese have placed pipes in the ground and in the crevices about the craters of these so-called geysers in such position that when activity is resumed these gases, fumes, or vapors are collected in pipes and thereby conducted into hermetically tight reservoirs, several pipes leading to the same reservoir, where they are condensed into sulphur, and from which reservoirs the sulphur flows down the mountain side in long tight conduits, where it hardens and from which it is taken, broken into various shapes, put into sacks, transported by coolies down the side of the mountain, and becomes a subject of commerce under the name of Bungo sulphur.

The merchandise involved in this case is imported in sacks or other packages and is conceded to be practically pure sulphur. Various samples have been analyzed and the analyses given in evidence. Therefrom it appears that every sample contains more than 99 per cent of pure sulphur and some samples run as high as 99.9 per cent pure, and the evidence shows that this sulphur is as pure as artificially refined sulphur, which appears to be the purest sulphur otherwise obtained.

The main contention of the importers is that this Bungo sulphur is a natural or crude sulphur and not refined, and that the word "refined" as used in the quoted paragraph implies a sulphur product which is the result of artificial processes applied to produce the condition of purity.

The chief contentions of the Government are, first, that the term "refined," as used in the paragraph, means sulphur containing practically no impurities, regardless of how it is produced; that is, it means a *condition* and not a *result*, and, further, that the facts in this case show what is the equivalent of an artificial refining process.

Evidence was introduced by the importers which tended to show that in trade and commerce this merchandise was known as natural or crude sulphur, while the evidence on the part of the Government tended to show that it was commercially known as refined sulphur, but, as we understand, it is not claimed by either side that a commercial designation has been established.

It is agreed that in the process of refining sulphur by wholly arti-
ficial means a considerable degree of heat is always required, and it
appears that the throwing off of the sulphurous fumes, gases, or
vapors from which the sulphur is obtained from these so-called
geysers in Japan is always accompanied by the presence of a con-
siderable degree of heat. It also appears that unless these fumes,
gases, or vapors are collected they pass into the atmosphere; that
there does not follow therefrom a deposit of sulphur on the surface
of the ground to any considerable extent, and that whatever is so
deposited is not practically pure as is the merchandise here, but is
mixed with impurities of various kinds.

This sulphur, although practically pure, has not been brought to
that condition by wholly artificial means, and, indeed, to know, if
the fact were material, whether it is chiefly produced by artificial
means, would involve a knowledge as to the form in which the sulphur
existed in the crater of the geyser and the natural forces or processes
which produced therefrom the sulphurous fumes.

But we are of opinion that this sulphur is not the refined or sublimed
sulphur referred to in the duty paragraphs, and are satisfied that
such sulphur is that which is produced by artificially applying the
process of sublimation to a cruder form thereof which may be arti-
ficially or naturally brought into existence.

Without going into the details of the processes employed, sublima-
tion of sulphur is the artificial distillation thereof, in the course of
which the sulphur content of the article distilled is, after vaporiza-
tion, deposited, collected, and formed according to the commercial
or other uses for which it may be designed.

It was said by the Board of General Appraisers in G. A. 3742
(T. D. 17756), decided in 1894, construing language identical with
that in the duty paragraphs before us, that the terms " 'sulphur
refined, sublimed, or flowers of' are interchangeable, refined sulphur
being obtained only by sublimation and one of the forms evolved
therefrom being flowers of sulphur."

In G. A. 432 (T. D. 10937), decided in 1891, it was stated by the
board that to produce refined sulphur it was sometimes necessary to
resort to more than one subliming process, depending apparently
upon the quantity and kind of impurities present in the article from
which the sublimed sulphur was to be produced.

The Treasury Department in 1876, by Synopsis 3032, construing
the meaning of the term "brimstone, crude," given free entry in the
act of 1870 and which was taken out of the duty provisions of the
act of 1864, where it was used in contradistinction to the term "brim-
stone in rolls or refined," said, in substance, that crude brimstone
was procured from sulphurous ore by roasting, fusing, or smelting,
and that refined brimstone was obtained from the crude brimstone

by the process of vaporization and sublimation, which released all foreign matter and left the article chemically pure.

In this connection, also, reference may be had to rulings of the department in Synopsis 8442 and T. D. 31962, which are consistent with the view that to be dutiable as refined the sulphur must be the product of sublimation processes, although we do not fail to note that in the last-mentioned Treasury decision Bungo sulphur was claimed to be refined within the meaning of the duty paragraph. Inasmuch, however, as the question of its dutiability was then challenged by the protests in the case now before us, the department's reserve as to this sulphur was proper.

We think that the treatment of the subject of sulphur or brimstone, which, as the latter word is commonly used, is sulphur or a form thereof, by Congress and by the department for more than 25 years clearly indicates that the refined or sublimed sulphur referred to in the duty paragraphs was understood to be the result of one or more processes of artificial sublimation and did not, and does not now, refer to a pure or substantially pure sulphur naturally produced or to one in the production of which artificial processes are employed to no greater an extent than in this case. The fact that Congress has not seen fit to use the words "pure or substantially pure" or their equivalent in describing dutiable sulphur seems to corroborate this conclusion.

If it be conceded that the question is a doubtful one, the settled rule is that the importer in such a case is entitled to the benefit of the doubt.

The various other court and board decisions referred to by the Government are not inconsistent with this conclusion, because, as we understand them, it was found in every instance that the sulphur was in fact refined, and in none does it appear that it was produced in the same manner as the merchandise here.

It remains, however, to determine the application of the free-entry paragraphs to this sulphur. The Government urges that if it be found that the sulphur is crude these importations are not in bulk, and therefore not entitled to free entry. The words "in bulk" have received such legislative definition and administrative construction that we think this contention is sound. In paragraph 295 of the act of 1909 salt "in bags, sacks, barrels, or other packages" is made dutiable at one rate and salt "in bulk" at another. This indicates that in legislative contemplation the term "in bulk" excludes such containers as used in the importation here. Again, section 2990 of Revised Statutes and a ruling of the Treasury Department in Synopsis 2980 (1876), clearly are to the same effect and the common understanding of the term "in bulk" would seem to render further discusion of that subject unnecessary.

But we do not think this merchandise is the *crude* sulphur or brim-stone of the free-entry paragraphs.

It does not follow because it is not *refined* within the meaning of the duty paragraphs that it must be *crude* in the sense that word is used in the free-entry paragraphs. Neither does it follow that any article that is not refined or pure in the common meaning of the term must necessarily be crude within the same meaning.

Without undertaking to define with precision the meaning of the word "crude," and it is evident its meaning should be determined with reference to the article to which it is applied, it would seem to commonly refer to substances or articles in a condition unfit for the ultimate purpose or use for which they are intended.

In United States *v.* Chemical Co. (2 Ct. Cust. Appls., 165; T. D. 31679), this court, in discussing the meaning of the word "crude" in paragraph 482 of the act of 1897, referring to articles in a crude state used for dyeing, etc., said that the merchandise there was crude in two respects: First, that it was an article in the state of its first production without being refined by additional treatment applied for the purpose and was mixed with various impurities; second, that it was crude because not in a condition fit for use for dyeing, etc., but was only the raw material which by further treatment could be made fit for such uses.

In United States *v.* Danker (2 Ct. Cust. Appls., 522; T. D. 32251), the same paragraph as in the preceding case was again under consideration, and it was there said that "as applied to materials crudeness is a relative term, and to determine whether or not a thing is crude for industrial purposes some account must be taken of its intended use. However much a thing may be processed, if, as a matter of fact, it must go through some additional process of substantial preparation or manufacture in order to fit it for its chief or only use, it is, so far as that use is concerned, a crude article."

In United States *v.* Sheldon (2 Ct. Cust. Appls., 485; T. D. 32245), the question of whether the merchandise was gum resin, crude, was under consideration by this court, and it was said (p. 489) that the resin there which was held to be crude within the meaning of paragraph 559 of the act of 1909 was in a condition which forebade its "being subjected *per se* to final or further uses without substantial processes being applied."

The sulphur in this case, as appears from the evidence, is not only practically pure, but in its imported condition is fit and ready for nearly all the uses to which refined sulphur may be applied. It is not in the form nature first presented it or in a form resulting directly therefrom, but is instead in a form which is brought about by the intervention of human appliances and which have resulted in a much purer article than nature, if left alone, would have produced. Whether it is referred to as natural or elementary sulphur or by some

other of the terms which are employed in Synopsis 3032 and T. D. 10936 is not of special importance, because, being sulphur and not being crude, it falls within the descriptive term "sulphur not otherwise provided for" in the free-entry paragraphs.

The judgment of the board of general appraisers is *reversed*.