(C. D. 768)

F. Lester Kittle, Inc., et al. v. United States

United States Customs Court, Third Division

(Decided May 12, 1943)

*Sharretts & Hillis (Edward P. Sharretts* of counsel) for the plaintiffs.
*Paul P. Rao*, Assistant Attorney General (*Joseph F. Donohue*, special attorney), for the defendant.

Before Cline, Keefe, and Ekwall, Judges

Keefe, Judge: In this case certain rubber in sheets, described on the invoices as sole crepe, was classified by the collector under paragraph 1558 of the Tariff Act of 1930 as a nonenumerated manufactured article and assessed at 20 per centum ad valorem. The plaintiffs claim that the rubber is properly entitled to free entry under paragraph 1697 as crude india rubber.

At the trial the protests were consolidated and it was agreed that the official samples correctly represent the merchandise covered by the respective protests and they were received in evidence and marked collective exhibits 1 and 4, and exhibit 2, and exhibit 3, respectively. By agreement certain samples of rubber were marked in evidence as illustrative exhibits, as follows:

A, B, C, D, E, F, G, H, I, J, K, L, M, N, O, P, Q, R, S, T, U, V, W, X, Y, Z, AA, BB, CC, DD, EE, FF, GG, HH, II, JJ, KK, LL, MM, NN, OO, PP, QQ, RR, SS, TT, UU, VV, WW, XX, YY, ZZ, and AA-1.

We will not here enter into a description of the various illustrative exhibits or of the official samples as we feel they will be sufficiently identified and described in the setting out of the testimony of the plaintiffs' witnesses.

The plaintiffs' first witness, Richard C. Lepper, testified that he has been a dealer in crude rubber for more than 25 years, having 13 years' experience in the Far East in buying rubber for a large United States manufacturer, and since that time has been importing and selling crude rubber in the United States for one of the plaintiffs. He examined the samples in evidence and from his experience in the rubber industry was able to testify not only as to the kind of rubber in the various samples, but the country and place of origin and the method of production.

The witness then proceeded to describe the methods used in the production of crude rubber substantially as follows: The sap or latex, milk-white in color, is taken from the rubber tree by tapping the outside layer of the bark. To the latex thus collected certain acids are added in order to produce a uniform coagulation. The material, after coagulation, is taken to the factory where the manufacturer determines the kind of rubber to be produced, there being two varieties of rubber, described as ribbed smoked sheets, a basic product largely produced, and the second a latex crepe, the product here in question.

Ribbed smoked sheets, the final product of processing rubber latex into crude rubber, are represented by illustrative exhibit I. To produce such sheets, thick pieces of dough, resulting from coagulating latex with acids, are put through a series of rollers, the last rollers having an imprint upon them which forms a ribbed impression on each side of the sheet, the purpose thereof being to effect a uniform drying of the rubber. After such process, where the thick pieces of dough are changed into thin sheets, the sheets are hung in a smoke-house for 14 days, the heat there acting as a drier. They are kept at a constant thickness to facilitate the smoking and drying process and for no other purpose. The smoking of rubber tends to preserve it. After examination for defects, the smoked and dried sheets are ready to be packed for shipment. Smoked sheets generally, with very few exceptions, are not "stamped out," that is, they are not used in their imported condition without further processing, being usually compounded with pigments, primarily sulphur (the basis of vulcanization), carbon black (used mainly for tires), and zinc oxide.

In the production of crepe rubber, large chunks of coagulated latex or "dough" are placed in a vat and bleached with sodium bisulphite. These chunks are then put through a series of rollers to form thin sheets, 18 feet long and 11 inches wide, and are hung up to dry for 15 to 20 days. These white sheets are hung in the same manner as smoked sheets, although they are placed in a smoky room rather than a smoke room. The sheets are also kept at a constant thickness to facilitate the drying process. After such drying the crepe rubber sheets are ready to be packed for shipment. Illustrative exhibit K represents the bleached crepe rubber produced by the foregoing processes. In distinguishing these two exhibits of basic material, the witness stated that illustrative exhibits I and K are intrinsically the same except for color and have the same tensile strength and properties, although illustrative exhibit K is a little more expensive to produce and to ship. Illustrative exhibit K could be used for bathing caps, shower curtains, girdles, nipples for babies' bottles, white sidewall tires, or for any article where a light-colored product is needed and illustrative exhibit I could be used for all of these articles for which

illustrative exhibit K is adaptable, except for the color. Both exhibits are suitable for use in the manufacture of an inner tube because they have the same tensile strength. These rubber sheets, as represented by the foregoing exhibits, are known as "a manufacturer's demand."

It might be noted here from an examination of illustrative exhibit I that it is a dark reddish-brown sheet about ⅛ of an inch in thickness, ribbed on both sides. Illustrative exhibit K, however, is a very thin light cream-colored crepe.

Continuing his testimony the witness stated that during the process in the manufacture of the latex into rubber, these single sheets may be laminated, or built up into thicker sheets. In lamination, the single sheets are required to be put together at a certain specified time during the drying period, otherwise they will not stick together and the lamination cannot be successfully accomplished. After the rubber sheets have hung in the drying room for the required time they are taken from the drying racks by coolies and laid one upon the other. In selecting sheets to be laminated care is taken to match them so they do not overlap, to eliminate sheets having lumps as the rubber in such lumps would be undercured, and to eliminate wrinkles, which would put a bulge in the rubber and render it unfit for shoe manufacture. When placed one over the other in such manner the sheets adhere to each other without the addition of any sort of an adhesive and cannot be taken apart. Upon attaining the required thickness, the laminated sheets are run through rollers and then trimmed to size. Like smoked sheets, white sheets are packed in bales as bulk articles for shipment. If sheets such as illustrative exhibits I and K were not laminated during the process of manufacture of the rubber they could not be put together later because they would not permanently adhere to each other. The milling of pale crepe rubber in the United States to form sheets of definite thickness has never been accomplished with success because white rubber heats in the rollers and tends to darken the product and destroy the nerve or resiliency of the rubber. Thus its firmness is not retained and rubber so produced would be of inferior quality.

As to collective exhibits 1 and 4, and exhibits 2 and 3, the witness testified that they consist of the same crepe rubber as in illustrative exhibit K except the sheets are thicker; that in order to produce such merchandise sheets like illustrative exhibit K are laminated; that collective exhibit 1 would require the lamination of about two sheets, and exhibit 2 would require about six sheets.

An examination of the samples discloses that collective exhibit 1 consists of sheets of a cream-colored crepe less than ⅛ of an inch in thickness; exhibits 2 and 3 present a similar crepe about ¼-inch thick; and collective exhibit 4 consists of two sheets, one a very thin cream-colored crepe and the other about ⅛ of an inch or more in thickness.

The witness further testified that rubber sheets are always made larger and trimmed to size; that the samples of the merchandise in evidence are made to certain definite specifications as to width, length, and thickness, to wit, 36 inches by 13 inches by a predetermined thickness, as required by the manufacturing industry. Such sheets are especially dedicated to the manufacture of rubber-soled shoes.

The witness testified at length in connection with each of the illustrative exhibits of crude rubber, including the bleached crepes as well as the smoked sheets. Illustrative exhibits A, U, DD, GG, and LL consist of cream or light-tan colored sheets of crepe, some having rough surfaces on both sides, others with a rough surface on one side, and the remainder presenting both surfaces fairly smooth, and ranging in thickness from ⅛ to ½ inch. The witness described these exhibits as being laminated and produced in the same manner as the imported merchandise except that after lamination they were put through different shaped rollers, and that such sheets are used in the shoe industry. (Our examination of illustrative exhibit GG discloses that it is identical in appearance, thickness, and size with the thicker sheet in collective exhibit 4.)

Illustrative exhibits L, O, CC, and KK, the witness stated, were used in the shoe industry in making the mid-soles. (We find upon examination that these exhibits are light-colored crepes, a trifle thicker than illustrative exhibit K.) Illustrative exhibits R, AA, EE, and FF are ivory-colored sheets of rubber of very fine texture and were described by the witness as highly specialized rubbers, known as "premium rubber" and used in individual sheets as imported, and manufactured for and dedicated to specific uses. He stated that these rubbers represent the whitest quality imported and are especially desirable for some grades of cement, for food wrappers, and in making various forms of prophylactics; and that they are required to be of a uniform thickness and of certain length, the processing thereof in the manufacture of the rubber making them valuable for their required purposes. Illustrative exhibits F, G, H, M, N, Q, S, W, Z, and HH represent ribbed smoked sheets like illustrative exhibit I. The witness testified such sheets are used for making any article requiring rubber, exhibit M being manufactured particularly for self-sealing gasoline tanks used in airplanes. Illustrative exhibits B, J, V, Y, and BB represent brown crepes and the witness testified they consist of individual sheets pressed together but not laminated, although they are very hard to pull apart, and that such sheets are principally used in the manufacture of tires and rubber sponges. Illustrative exhibits J and Y were described by the witness as cuttings from merchandise like the official samples herein. He stated that such cuttings through remilling could not again become suitable for the same uses as exhibits 2 and 3 and collective exhibits 1 and 4, but

nevertheless, when remilled, they are usable for any other purpose where a pale crepe is required. Illustrative exhibit II was described by the witness as being a rough-surface crepe with enough bulk to enable soles to be punched therefrom, but that it was not the type of rubber usually used for soles. This exhibit is light-tan colored and about a quarter of an inch thick, and is in a sheet about 6 feet long and 15 inches wide, having a rough crepe surface. According to the witness it is imported in long folded pieces. Illustrative exhibit JJ was described by the witness as the trimming from a piece of sole crepe after the sole had been stamped out, and that rubber in such condition is suitable for use by "anybody using white rubber."

Plaintiffs' second witness, Richard K. Baltzer, is a factory manager in the shoe industry, having had 9 years' experience with the Avon Sole Co., one of the largest manufacturers of rubber soles and heels and crepe soles. In such capacity he was in charge of production and had supervision and control of the various processes used. He also purchased a great many raw materials used in the factory.

Mr. Baltzer testified that the rubbers used in his plant for making rubber soles and heels are of the character represented by collective exhibits 1 and 4, and exhibits 2 and 3, and illustrative exhibits L, M, N, O, Q, R, AA, U, JJ, DD, FF, KK, and LL. That when merchandise like the foregoing exhibits is received, the bales are opened and the sheets gauged for thickness. The soles and heels are then cut from the sheets and the pieces so cut are built up to the required thickness. That because the thicknesses desired by their various customers are not always obtainable in the available range of sheets, it is often necessary to build up to the thickness required by cementing together sheets of varying thicknesses. Using illustrative exhibit UU, a completed sole, as an example the witness testified that the heel was built out of three layers of sheets of sole crepe rubber, and, after beveling, was cemented to the sole. The sole, of only one layer of material, is stamped out of a sheet in the condition in which it came to him. The witness testified that unsuccessful attempts have been made to form soles out of single sheets of crepe rubber that have not been laminated. It was found that any mechanical manipulation or solvent action breaks down the molecule of the rubber, making it softer, more sticky, and less resistant to wear. In addition, the color of the crepe becomes darker. As a result of experimentation along that line it was found that it was impossible to produce rubber sheets such as collective exhibits 1 and 4, and exhibits 2 and 3, by the means of cementing single sheets like illustrative exhibit K.

In describing how to make a complete finished sole, using either collective exhibits 1 or 4, or exhibits 2 or 3, the witness stated:

Referring to Illustrative Exhibit PP, (a pair of soles and heels of ivory colored fine crepe) after opening the case, pulling the sheets apart, gauging them for

thickness, we cement two of them together to form the sole, and cut the soles out. This heel here was not built up. We were able to obtain that thickness directly so that heel was cut out. Then the heel was beveled at an angle, and stuck to the sole. Then we take these, put paper between them, stamp sizes on them, put labels on them, and also incorporate with it a mid-sole, so-called, which is first stitched to the shoe, and then this sole is cemented to the mid-sole.

A mid-sole is called in the shoe trade a first unit. It is a thinner layer of either crude or crude vulcanized rubber which is stitched to the shoe bottom.' Then the crepe sole is cemented to that, so that the stitches do not show through on the outside and wear off.

Continuing his testimony the witness stated that the thin sheet in collective exhibit 4 is used to build up other sheets to the required thickness. Referring to illustrative exhibits DD, LL, and U, the witness said that for many years rubber in a like condition had been used by grinding the sheets into a pulp, incorporating pigment, sulphur, accelerators and vulcanizing it, and from the vulcanized product soles were stamped out just as from the merchandise at issue here; that for the past 4 years soles have been stamped out of such merchandise when in the condition as appearing in the exhibits. Illustrative exhibit OO, a pair of soles made of rough surfaced cream-colored crepe on the outer surface and a smooth crepe a little darker in color on the inner surface, having a sole about a half-inch thick and a heel an inch thick, was used by the witness as illustrative of the manner in which illustrative exhibits DD, LL, and U were used directly in the manufacture of soles.

Referring to this exhibit the witness in answer to a question testified as follows:

Q. I notice there are apparently two layers put together. Is that in accordance with the way you have testified, that each one itself is a laminated product that came in in that shape, and then you stuck it to another product?

A. The top layer, the rough layer, was cut directly out of the sheet. Then the customer required a thicker sole than that produced, so we backed that up with a re-milled proposition, which we did ourselves. It is of inferior quality, and color, but because it is on the back of the sole, it doesn't matter so much. You get the required thickness. (Record p. 60.)

Testifying further regarding illustrative exhibits LL, U, and DD, the witness stated that for the past 2 or 3 years his firm has been using such material from which to stamp out soles in the same manner as from collective exhibits 1 and 4, and exhibits 2 and 3. Since starting to make crepe soles directly from rubber represented by such exhibits, the plantations have tried to conform to his firm's requirements by giving them sheets of definite thickness and size rather than a "helter-skelter mixture" as formerly; that the material now received is actually the same, the uniformity in packing having merely been improved; that his firm would stamp out a sole from illustrative exhibit U and deliver it without further treatment as a good rubber sole, and would

not mind if there were more than $\frac{1}{16}$ of an inch variation in the thickness because they did not confine themselves to those limits on that rubber; that illustrative exhibit LL would also be used for stamping out a sole, and where there was a hole in the sheet that part would be discarded as scrap; that although all of illustrative exhibit LL could not be used for soles because of the holes, neither could all of collective exhibits 1 and 4, and exhibits 2 and 3, because the trimmings in those exhibits are also discarded as scrap; that crepe rubber like illustrative exhibit LL when imported in bales is used in the same manner as smoked sheets and the sheets also are torn apart sheet by sheet and used directly for soles; that such sheets do not conform to any specific thickness but they are uniform in thickness throughout the bale; that the uniformity in the sheets like those in illustrative exhibits LL and U adds to the facility of separating them, whereas formerly such rubber was imported in long folded pieces like that shown in illustrative exhibit II; and that neither illustrative exhibit II nor T is the sort of rubber used for stamping out soles.

Following the foregoing testimony as to illustrative exhibits DD, LL, and U, counsel for the Government conceded that merchandise as represented by such exhibits was admitted free of duty as crude rubber and had been so classified for the past 40 years.

The witness further testified that illustrative exhibit AA was also used for making rubber bandages by merely separating the layers into long streamers, cutting them to the desired width and dipping them very quickly into a solvent solution and drying them, thus producing strips with a "tacky" surface so as to enable the bandage to stick to itself. In making such bandages the sheets are used in their imported condition.

Four samples, red in color, were admitted in evidence as collective illustrative exhibit AA-2, being vulcanized soles made from the smoked sheet type of rubber such as illustrative exhibit F. The witness testified that a sole made from a rubber-crepe sheet is much more durable than one made from vulcanized rubber as the natural crepe sole has all the natural toughness of crude rubber, whereas in vulcanized rubber, it is the vulcanization that restores the natural toughness of crude rubber after it has been destroyed.

This case has been especially well prepared and presented by counsel for the plaintiff and the Government. In agreeing by stipulation to admit in evidence not only samples of sole rubber covered by the protests but also the illustrative exhibits, they have given to the court a comprehensive display of the forms in which crude rubber is imported as raw material in our industries. Examination of these exhibits in connection with the testimony of the two expert witnesses has been of great assistance to the court in reaching a decision herein. We have

been further aided by the excellent briefs of counsel for both plaintiffs and defendant. The history of the production and development of rubber in plaintiffs' brief is not only succinctly described but shows great research and has been helpful to the court in reaching a conclusion in this case. We have therefore elaborately detailed the testimony of these two witnesses in order to set forth the facts relative to the exhibits.

The plaintiffs contend that the rubber sheets in question consist of rubber in the crudest form in which crude rubber can be imported for use as a raw material in the manufacture of crepe soles for shoes, and, as such raw material, it is entitled to free entry as india rubber in its crude state.

The Government, on the other hand, contends: First, that the rubber at issue is advanced beyond the point of being crude as it is prepared especially for a particular purpose; second, that the lamination thereof produces a product comparable to vulcanized rubber; third, that it has new characteristics suiting it for new uses for which crude rubber is unsuited; and fourth, that such rubber is distinguished from crude rubber by the particular form or size and thickness of the sheets, as well as by the higher price.

The paragraphs of the Tariff Act of 1930 involved here provide as follows:

PAR. 1697. India rubber and gutta-percha, crude, including jelutong or pontianak, guayule, gutta balata, and gutta siak, and scrap or refuse india rubber and gutta-percha fit only for remanufacture.

PAR. 1558. That there shall be levied, collected, and paid on the importation of all raw or unmanufactured articles not enumerated or provided for, a duty of 10 per centum ad valorem, and on all articles manufactured, in whole or in part, not specially provided for, a duty of 20 per centum ad valorem.

A change in practice occurred, occasioned by a ruling of the Commissioner of Customs, published in T. D. 50020 (3), whereby rubber like that here imported was taken from the free list and classified as a nonenumerated manufactured article. The department ruling provides as follows:

(3) Crepe sole rubber, in the form of sheets, plain or corrugated on one side, colored or uncolored, prepared to a definite thickness as a single sheet or by the lamination of several thin sheets to a definite thickness, whether or not cut into regular dimensions, and in such form ready to be cut into soles for shoes, is dutiable at the rate of 20 per cent ad valorem under paragraph 1558, Tariff Act of 1930, rather than free of duty as crude rubber under paragraph 1697 of the tariff act. * * *.

It will be noted by the foregoing ruling that rubber sheets prepared to a definite thickness as a single sheet, or by the lamination of several thin sheets to a definite thickness, whether or not cut into regular dimensions, whenever in such form that they may be cut into soles for shoes, are taken from the crude rubber paragraph. Therefore

the form of the sheets herein seems to be the main consideration motivating the change.

In reviewing the legislative and judicial history of the crude-rubber paragraphs of the various tariff acts as well as the judicial interpretation of the word "crude" we find that refinements of rubber undertaken for the purpose of rendering an article uniform or homogeneous in texture would not take it out of the class of "crude." Certain guttapercha, which had been boiled and fitted especially for use in making golf balls, was held not to have been so refined as to remove it from its classification as crude, as it had not undergone any process of manufacture whereby its commercial name or essential character had been changed. See *in re Downing & Co.*, G. A. 4191, T. D. 19528. Our appellate court cited with approval the *Downing* case, *supra*, in *United States* v. *Sheldon*, 2 Ct. Cust. Appls. 485, T. D. 32245, and, as to the Government's position in that case, stated as follows:

Under the construction contended for only the crudest form of this gutta-percha could be admitted free, and so, without doubt, with reference to every article coming within the provisions of paragraph 559 (the crude gum resin paragraph, Act of 1909). Such a construction would render the statutes practically nugatory.

Further in the case our appellate court, relative to the meaning of the word "crude" in tariff legislation, stated:

The word "crude" as used in tariff laws has by construction and a long consistent line of decisions been given a meaning somewhat variant from its common and accepted meaning, the frequent re-enactment of the term in the statute having been tantamount to a confirmation thereof. What constitutes a refining or advance in condition from the crude state of the article has, likewise, been the subject of judicial and legislative construction, and it is not every manipulation, though it may add something to the value or condition of the article, which may be held to bring it within such language of the statute. Its presence in a tariff act requires that it be construed with a thought to its apposite conditions provided in the act, to wit, manufactured or a condition of substantial advancement by processing.

In *United States* v. *Danker & Marston*, 2 Ct. Cust. Appls. 522, T. D. 32251, involving certain gum tragasol which had been assessed as a nonenumerated manufactured article, and claimed to be free as an article in a crude state, the Government contended that the article was the result of a careful and elaborate process of manufacture, and when once evolved it was so finished and complete that it was ready for use without any refinement or alteration in its essential form and character, and consequently could not be considered as "crude" inasmuch as such term refers to something in a natural or raw state— something which had not been processed or prepared, something that had not been manufactured, or, if manufactured, not refined. Relative to such contentions the court there stated:

The trouble with this argument is that we are not willing to subscribe to the definition of "crude," upon which it is based. For the purposes of this case it

may be conceded that things which are in a natural or a raw state, which are not processed or prepared, which are not manufactured or if manufactured not refined, are in fact generally regarded as crude articles, but from that it does not follow that no article is in a crude state which has gone beyond its natural or raw state or which had been processed, prepared, or manufactured.   *   *   *.   As applied to materials crudeness is a relative term, and to determine whether or not a thing is crude for industrial purposes some account must be taken of its intended use. However much a thing may be processed, if, as a matter of fact, it must go through some additional process of substantial preparation or manufacture in order to fit it for its chief or only use, it is, so far as that use is concerned, a crude article.   *   *   *.   That it was not the intention of Congress to put a meaning upon the term "crude" which would confine crude articles to those which were raw, unprepared, unmanufactured, or in a natural state, is evidenced by the fact that many articles clearly manufactured are enumerated as crude articles in one or both of the tariff acts here under consideration;   *   *   *.

Our appellate court commented upon what may be considered a constituent of a manufacture in *United States* v. *American Bead Co.*, 9 Ct. Cust. Appls. 27, T. D. 37873, where it was stated:

An article not an actual constituent of a manufacture can not be considered as part thereof unless it has been advanced to a point which definitely committs it to that specific class and kind of manufacture.   An article commercially suitable and commercially used for the making of different things is a material which is just as much adapted to the production of all of them as it is to the production of any one of them, and until it has been finally appropriated to some definite manufacturing use and has been given the distinguishing characteristics which clearly identify it as one of the components ultimately to be assembled into a particular completed whole, it can not be regarded as a part of any specified manufacture.

The case of *United States* v. *National Importing Co.* *(Inc.)* *et al.*, 12 Ct. Cust. Appls. 186, T. D. 40169, involved certain pieces of pressed amber or amberoid resembling pipe bits and cigarette holders except that they were not bored or so shaped as to be usable for those purposes in their imported condition, although very little change would be required to make them conform exactly to the various kinds of pipe bits and cigarette holders in common use.   The merchandise was made of small bits of amber pressed and molded into the forms imported and was known as pressed amber or amberoid.   The Government there contended that an examination of the merchandise was sufficient to warrant its classification as smokers' articles, and to compel the conclusion that it was partly manufactured, thus excluding it from classification as "amber and amberoid, unmanufactured." The importers contended that even though the amberoid pieces bear an exact resemblance to pipe bits or smokers' articles they have not been manufactured to such an extent as to commit them or dedicate them to use as such, nor to render them commercially unfit for other uses, and in view of the evidence establishing that they are used to make jewelry as well as smokers' articles they must be classified as amberoid, unmanufactured, even though the articles imported were sold to a manufacturer of smokers' articles.   In holding that the

merchandise was classifiable as amberoid, unmanufactured, the court cited and followed the case of *United States* v. *American Bead Co., supra.*

Along this line of decisions we also draw attention to the case of *United States* v. *Rice Co.,* et al., 9 Ct. Cust. Appls. 165, T. D. 37998, where certain wheat stems with their heads on, in natural condition, sun-bleached, and having been tied into small bundles for use as semifloral ornaments or emblems were held to be crude or unmanufactured vegetable substances rather than nonenumerated manufactured articles, the court stating:

* * *. We think that the great weight of the authorities favors the free entry of such articles, sometimes classifying them as crude or unmanufactured vegetable substances under paragraph 552, supra, or its predecessors, and sometimes as textile grasses or fibers or fibrous substances under paragraph 497, supra, or its predecessors. * * *.

Two early cases indicate clearly that rubber in the condition of the rubber here before us comes within the definition of crude rubber. *Lunham & Moore* v. *United States,* T. D. 36787, G. A. 7983, involved certain rubber imported in sheets of definite size and thickness, to wit, 12 inches wide, 20 inches long, and ¼ of an inch thick. It was invoiced as "raw plantation rubber sheets." There also it was classified as a nonenumerated manufactured article. The evidence established that such rubber was designed particularly for the waterproofing of cloth used in making ponchos. The rubber had been pressed into sheets for convenience in handling and it had added thereto certain shellac and talc, reported as not natural to the gum in its crude state. The court was of opinion that the presence of talc or shellac would not constitute the commodity a manufactured article even though its content in the rubber was not explained. In holding the rubber sheets to be free as crude rubber the court took into consideration the fact that the commodity had been imported into the United States, "passed and used as rubber," and that the reason for departing from previous classification of the article as crude rubber to wit, that it contained substances not found in crude rubber, was insufficient to warrant a holding that the merchandise was manufactured, and the court, notwithstanding evidence establishing that the particular rubber sheets were designed for the waterproofing of cloth, stated:

* * * ' the fact remains that the article under consideration is in a crude state, and is used for the same purpose for which rubber is used, and, in our opinion, resembles crude rubber as the record in this case reveals crude rubber, samples of which were introduced as illustrative exhibits.

In *United States* v. *Michelin Tire Co.,* 1 Ct. Cust. Appls. 518, T. D. 31544, the court found that the particular rubber there in question like crude rubber was "fit for manufacture in some cases without any additional processes being applied to prepare the rubber for manu-

facture," and that it had "not entered to any degree upon its course as any certain manufactured article," but was "a raw material suitable for use in the manufacture of innumerable articles," and in the case of *Magee & Co. et al.* v. *United States*, 4 Ct. Cust. Appls. 443, T. D. 33874, the court in distinguishing crude rubber in its various forms stated:

\* \* \*. It would seem not to be very important, in determining whether rubber is crude, to distinguish its various forms, whether it be cut into small pieces or into large pieces or in one shape or form or another so long as it has not reached the dignity of an article, but is merely the material out of which an article is made. While it is such it would seem to be crude material, hence crude rubber.

\*　　　\*　　　\*·　　　\*　　　\*　　　·　\*　　　\*

We think it is clear that the purpose of Congress was, as stated, to admit free of duty rubber which was a material for the manufacture of india-rubber articles and which was nothing more. This was sufficiently provided for as to rubber in any form so long as it was crude.

It is clear from the foregoing that the courts have construed the congressional intent in enacting the crude-rubber paragraph as placing on the free list all india rubber, whatever its source or condition, imported to be used as a material in the manufacture of india-rubber articles and so enacted solely to permit free entry of india rubber as and when a manufacturing material.

The Government relies particularly upon the case of *United States* v. *Wilkinson Process Rubber Sales Corporation*, 22 C. C. P. A. 60, T. D. 47051, construing such decision as holding that when a product resulting from the processing of latex possessed many if not all of the characteristics of vulcanized rubber, such product would be removed from classification of rubber in the crude state. However, the product there before the court was not comparable to the crude rubber of commerce in any stage of its manufacture. When it reached the state of a crepe sheet ready for drying it had neither the chemical composition nor the color of rubber crepe, and the processes thereafter applied, which included lamination of the sheets both for thickness and width, evolved a sheet 4 or 5 feet wide and 50 feet long of homogeneous structure known as "linatex" and having all of the characteristics of vulcanized rubber. The court noted in its decision that there was an intermediate stage between regular plantation crepe, "a form of crude rubber" and what the witness deemed to be vulcanized rubber, that was made by laminating a sufficient number of layers of ordinary plantation crepe together so as to form sheets of material suitable for use as shoe soles. However, the court observed that it was made clear that rubber so treated was not the same kind of rubber before them in that case. It was held that the "linatex" was evolved through a new and patented process which removed it from the crude rubber paragraph through a manufacturing effort. It will be noted that the product there had a new name and

new uses, to wit, uses to which only vulcanized rubber was adaptable. The merchandise here before us, although at the time of importation it was devoted chiefly as a material in the manufacture of rubber soles for shoes, was suitable for use for any purpose a light crepe rubber was required.

It will be noted from the evidence that the crepe rubber in question is not used as soles for shoes without further manufacturing effort. Although it is made to conform as nearly as possible for marketing in the rubber-sole industry, after receipt by the shoe manufacturers it is required to be built up to the thickness of soles and heels according to customer requirements by gluing the various sheets together and then mid-soles have to be added. The processes necessary to complete a sole and heel from a sheet of crepe rubber require no small amount of manufacturing effort. Were the meaning to be applied to crude rubber, restricting it to such an extent as to remove from that paragraph rubber suitable for marketing to the various industries requiring the use of crude rubber, such as here attempted by the Treasury Department ruling, all crude rubber, not in its crudest condition and not imported for remanufacture, would, under the same principle, be removed from the paragraph. Such restricted meaning of the term "crude rubber" was never intended by Congress and the various attempts by the Treasury Department to direct assessments of duty upon crude rubber, a free product, have been held illegal and consistently repudiated by the courts. Congress, in drafting the crude rubber paragraph evidenced no intention of delegating to the Treasury Department any authority to designate what particular kinds of crude rubber would be admitted free of duty. The merchandise before us, according to the undisputed evidence, is rubber in a crude condition, adaptable for use in the manufacture of all articles requiring a light crepe rubber.

For the reasons stated, judgment will be entered in favor of the plaintiffs, directing the collector to reliquidate the entries and make refund of all duties taken.