(C. D. 1937)

## B. L. LEMKE & Co., INC. *v.* UNITED STATES

United States Customs Court, First Division

(Decided November 19, 1957)

*John D. Rode* for the plaintiff.

*George Cochran Doub*, Assistant Attorney General (*Murray Sklaroff*, trial attorney), for the defendant.

Before OLIVER, MOLLISON, and WILSON, Judges

WILSON, Judge: The merchandise here involved was invoiced as "3 DRUMS CONTAINING CRUDE RUTIN 90/95% PACKED IN CRAFT PAPER BAGS." The product was classified by the collector under paragraph 34 of the Tariff Act of 1930, as modified by the General Agreement on Tariffs and Trade, T. D. 51802, and assessed with duty at the rate of 5 per centum ad valorem as a drug, not specially provided for, which had been advanced in value or condition by processing.

The importation is claimed by the plaintiff to be a crude drug, not advanced in value or condition, properly classifiable as free of duty under the provisions of paragraph 1669 of the Tariff Act of 1930.

There is no substantial controversy concerning the facts. The plaintiff introduced and read into evidence the deposition of one W. K. Burnside of Australia. The only witness called to testify in court was Dr. Paul Setz of Lodi, N. J. The evidence of these witnesses is not controverted. The only testimony presented by the Government consisted of the introduction of certain exhibits (A to C, inclusive).

From the undisputed evidence, it appears that the imported product, rutin, in its commercial form is a nonedible drug used for medicinal purposes in strengthening capillary blood vessels in human beings. The natural source of the drug under consideration is the leaves of the plant Eucalyptus Macrorhyncha, grown in Australia. The method by which the leaves are treated to obtain the imported product is described in Mr. Burnside's deposition, as follows:

\* \* \* The leaves of Eucalyptus Macrorhyncha are collected and dried and ground and placed in wooden vats and boiled. The mixture of leaves and water is then filtered and the filtrate allowed to cool. The rutin precipitates on cooling and this mixture of precipitated rutin and water is again filtered and the rutin placed in a drier and from that into packages for shipment.

According to the testimony of Dr. Setz, plaintiff's witness, the importation was subjected to the following treatment after its arrival in the United States:

Q. Can you tell us what is done with the merchandise the subject of this case after it is received by Lemke, after importation?—A. In order to purify it, we have to recrystallize the rutin which is contained in this crude material from alcohol, because in order to obtain a rutin which is suitable for medicinal purposes, it has to meet a number of other specifications, which are laid down in the National Formulary, volume 10. It must be clearly soluble in alcohol, which the crude material of course is not.

JUDGE WILSON: Is the material as imported soluble in alcohol?

THE WITNESS: Partly. The rutin which is in it can be extracted with alcohol, but there is up to 10 per cent impurities, which are not soluble.

BY MR. RODE:

Q. What are the purposes of the processes to which you subject them, to bring it to that——A. To bring it to a state that it will meet the requirements of the National Formulary.

\*          \*          \*          \*          \*          \*          \*

Q. Is any further processing done to the rutin after it leaves your place, to the rutin itself?—A. No.

\*          \*          \*          \*          \*          \*          \*

Q. As far as you know, is that the purest form the rutin will ever attain?— A. It is.

Q. In your opinion, Dr. Setz, in the condition as you received this rutin, would you say it was crude?

\*          \*          \*          \*          \*          \*          \*

THE WITNESS: Yes.

BY MR. RODE:

Q. Would you say that the rutin in its condition as imported was the first form of rutin by itself; I mean prior to the state in which you receive it, does rutin exist as such?—A. Rutin exists in the tree in the leaf as such.

Q. There it is in the leaf?—A. Yes.

Q. But rutin by itself, was the form in which you imported the rutin the first form of rutin by itself, separate from the leaf or the plant?—A. I would say so, yes. (R. 19–22.)

The position of the plaintiff, as set forth in its brief, on page 12, is that—

All of the processing applied to the leaves of the tree, Eucalyptus Macrorhyncha, were processes designed to separate and isolate the ingredient rutin. The rutin itself was not changed in any way whatsoever except for its separation from the leaves * * *.

The imported rutin is rutin in the crudest form known to commerce. It is not ready or available for use until it has been further processed and treated. * * *

In support of its position, the plaintiff cites the cases of *United States* v. *Magnus, Mabee & Reynard, Inc.*, 39 C. C. P. A. (Customs) 1, C. A. D. 455; *United States* v. *Sheldon & Co.*, 2 Ct. Cust. Appls. 485, T. D. 32245; *United States* v. *Judson Sheldon Corp.*, 33 C. C. P. A. (Customs) 73, C. A. D. 318; *United States* v. *Merck*, 66 F. 251; *United States* v. *Godwin*, 91 F. 753; *United States* v. *Danker & Marston*, 2 Ct. Cust. Appls. 522, T. D. 32251; and *Cowl* v. *United States*, 124 F. 475.

In the *Magnus, Mabee & Reynard, Inc.*, case, *supra*, certain "Chaulmoogra oil, imported in the form derived from the kernel of the seeds contained in the fruit of the Chaulmoogra oil tree in India" was held to be properly classifiable under paragraph 1669 of the tariff act, duty free as a crude drug.

In the *Sheldon & Co.* case, *supra*, the importation consisted of "gum resin or rosin." In describing the processes to which the original product was subjected prior to importation, the court stated, on pages 487 and 488:

There is no controversy that the material which first exudes from the trees and is caught in the receptacles is an oleoresin generally known as "crude turpentine"; that the distillation process employed, to which this oleoresin or crude turpentine is subjected, vaporizes the turpentine in the oleoresin, whereupon it alone passes through the worm of the still, is cooled, condensed, and collected in receptacles. The heat applied by this process is not sufficient to vaporize and therefore distil the rosin content of the oleoresin, but melts it sufficiently only to permit of the escape of the turpentine. By and as a part of the same process the residue of the oleoresin in the still *is let off through strainers* into a vat. The straining is but a minor incidental part of the process of separating the two contents of the oleoresin. Before it cools it is deposited in barrels, where by the action of the air it becomes hardened. The products of this operation are turpentine and the resin or rosin of commerce. The turpentine has been distilled, in that it has been vaporized, passed through the worm of the still, and then condensed. The rosin content has been heated, but not distilled or vaporized, and in being run off from the boiler of the still into a vat is passed through screens which take therefrom the chips, barks, insects, and dirt which accumulate therein in the reclamation of the oleoresin from the trunk of the tree. It is then deposited in the kegs of commerce. In this condition, as thus deposited in the kegs of commerce, so far as this record shows, it in no sense differs in the slightest particular from its condition as found in the trunk of the tree. Nor does it differ in the slightest degree from its condition during any step of its processing from the tree to the barrels of commerce save that it is separated by heating from the turpentine in one instance,

and separated by screening from dirt and chips in the other instance. It has had no process applied thereto, save that of heating to permit the escape of the turpentine, and, if it may be dignified by the term process, the straining into the vat through sieves taking therefrom the chips, barks, insects, and dirt, not therein an element of its natural condition, but deposited therein as an accident of its reclamation from its parent condition. The straining does not advance its crude or natural condition *per se*, but more nearly restores it to its crude or natural condition.

Considering the resin content alone, as in the tree, its crudest condition, the object being to take it from the tree and pack it in barrels, no process or treatment has been applied thereto which has advanced its value or condition as found in the tree, other than essential to the *proper* packing. The first process recovered it from the tree but did not change the rosin content *per se*. The second process reclaimed it from the turpentine and the dirt, leaves, and insects deposited therein by the first process, but did not change the rosin *per se*. The result of all these processes left it in a condition for proper packing and advanced it no further *from its crudest, natural, parent condition* in the tree than essential to its proper packing.. * * * [Italics quoted.]

The case of *United States* v. *Judson Sheldon Corp.*, *supra*, involved beef liver extract. This product had been prepared by grinding frozen beef livers, then separating "the soluble from the insoluble portions thereof by means of heat and water—the soluble portion being concentrated to a solids content of a certain percentage, imported in a pasty form and unsuited for use as a medicinal," and which had to be treated further in the United States to place it in condition to be prescribed by a physician for use. The court applied the principle set down in a previous case, *Vandegrift & Co.* v. *United States*, 13 Ct. Cust. Appls. 30, T. D. 40865, in which it cited the syllabus of the court's holding, as follows:

Certain inedible portions of cattle, such as glands, were imported, dried and ground, for the purpose of extracting medicine from them. They are drugs of animal origin, classifiable under paragraph 34, Tariff Act of 1922, if advanced, and under freelist paragraph 1567 if not. With the evidence showing that no way of transporting them was practicable except ground and dried, and that the ground and dried merchandise was less desirable than when fresh or frozen or dried whole, they must be held "not advanced in value or condition * * * beyond that essential to the proper packing * * * and the prevention of decay or deterioration pending manufacture." Accordingly they are classifiable under paragraph 1567.

In the *Judson Sheldon Corp.* case, *supra*, the Government argued that the collector's classification raised the presumption that the beef livers themselves, from which the involved merchandise was extracted, were crude drugs. As hereinbefore set out, the court refused to make such a holding, and stated, on page 81, that "the importation is a crude drug made from beef liver and has been subjected to none of the processes mentioned by the statute which advances it in value or condition beyond that essential to the proper packing of the drug and the prevention of decay or deterioration of the same pending manufacture."

It seems unnecessary to deal with the other cases cited by counsel for the plaintiff, since the Government agrees that the principle is well settled that "merely isolating a drug from its source does not constitute an advancement." In fact, the Government takes the position that it questions only the last process by which the rutin was separated prior to its importation. By implication, at least, it is admitted that the drying, grinding, boiling, and filtering of the Eucalyptus leaves were essential steps for the packing and preservation of the drug for exportation. It is contended, however, that when the filtrate from the mixture of leaves and water was again filtered, after the rutin had precipitated following the cooling, that final step constituted an advancement of the drug not essential for shipping or preservation under the meaning of the tariff law.

In support of its position, the Government cites the case of *U. S. Vitamin Corp.* v. *United States*, 43 C. C. P. A. (Customs) 44, C. A. D. 607, in which the decision of this court, C. D. 1664, was affirmed. In that case, beef liver extract, such as that involved in the case of *United States* v. *Judson Sheldon Corp.*, 33 C. C. P. A. (Customs) 73, C. A. D. 318, was subjected to an additional process, in that the liver extract in paste form, which had theretofore been shipped under refrigeration, was vacuum dried, pulverized, and then shipped in containers without refrigeration.

The issue in the instant case, therefore, finally boils down to the question as to whether filtering the mixture of precipitated rutin and water, so as to reclaim the precipitated drug, and then drying it before shipment constituted a process "beyond that essential to the proper packing * * * and the prevention of decay or deterioration pending manufacture."

We are of the opinion that it did not. Clearly, the water, from which the rutin had precipitated upon the cooling of the liquid, had to be disposed of in some manner. Furthermore, as in the case of the paste in the *Judson Sheldon Corp.* case, *supra*, the drying of the precipitated substance, rutin, was essential for its proper packing and preservation. The case before us is clearly distinguishable from the *U. S. Vitamin Corp.* case, *supra*, cited by the Government.

It appears from the record that, measured by the standards in effect at the time of the importation, the rutin in question was not suitable for use as a drug, but had to be subjected to an additional process in this country in order to refine it and place it in condition as a drug of commerce. The record on the whole indicates that the merchandise as exported consisted of rutin in the condition in which it had first been extracted from its original source, Eucalyptus Macrorhyncha, and that it had been subjected to no processing beyond that essential for its isolation from its natural source.

Based on the record here presented, we are of opinion and hold that the imported merchandise is properly free of duty under paragraph 1669 of the Tariff Act of 1930 under the provision therein for "Drugs * * * which are natural and uncompounded drugs and not edible, and not specially provided for, and are in a crude state, not advanced in value or condition by shredding * * * or any other process or treatment whatever beyond that essential to the proper packing of the drugs and the prevention of decay or deterioration pending manufacture," as claimed. The protest is sustained. Judgment will be entered accordingly.