(C. D. 779)

UNITED STATES RUBBER CO. *v.* UNITED STATES

United States Customs Court, Third Division

(Decided June 12, 1943)

*Arthur, Dry & Dole* (*H. P. Sadtler, Jr.*, of counsel) for the plaintiff.
*Paul P. Rao*, Assistant Attorney General (*Joseph F. Donohue*, special attorney), for the defendant.

Before CLINE, KEEFE, and EKWALL, Judges

KEEFE, Judge: The merchandise at issue here is an importation of white gutta-percha from the Netherlands East Indies Government Gutta-percha Estate Tjipetir in Java. It was assessed at 20 per centum ad valorem under paragraph 1558 of the Tariff Act of 1930, as a nonenumerated manufactured article. The plaintiff claims that the importation is properly entitled to free entry as gutta-percha, crude, under paragraph 1697.

Doctor H. R. Braak, chief advisor and superintendent of the Netherlands East Indies Government plantations and of the Tjipetir Estate, testified substantially as follows: Gutta-percha is a vegetable material obtained from the juice of the gutta-percha tree; that formerly in order to obtain the juice the trees were cut down and destroyed; and that on account of the widespread destruction of the trees the Netherland East Indies Government established an estate where gutta-percha was obtained from the leaves of the trees rather than from the trunk. In processing, the leaves were ground into a pulp and the mass boiled in water. By agitating the boiling mass the fine

gutta-percha threads meet and stick together and form so-called gutta-percha flakes which are "intensely mixed with the leaf matter," called dirt. The mass of material is diluted and cooled, the gutta-percha flakes coming to the surface are skimmed off, warmed, and pressed into slab shape. Such process results in the yellow Tjipetir gutta-percha, as represented by exhibit 2 in evidence.

The witness further testified that after the year 1926 the insulating material developed from the yellow gutta-percha was found to be inadequate for submarine cables. The company then started experiments to develop a method of extracting gutta-percha from its native condition which would permit a lesser quantity of dirt than contained in exhibit 2 in order to improve the insulating qualities of the product. Subsequent to 1928 the witness had developed the method, as set out below, used in obtaining a gutta-percha free from dirt, as illustrated by exhibit 3, the white gutta-percha imported herein.

The witness described the method of producing the instant merchandise substantially as follows: After the foregoing leafy mass had cooled and the gutta-percha flakes were skimmed off, approximately 2½ per centum of the vegetable matter and dirt still remained in the flakes. In order to remove as much as possible of such material from the gutta-percha, the flakes are placed in a cutting machine to reduce them in size and afterwards placed in a tank of hot gasoline where the gutta-percha dissolves. After allowing the mixture to settle, it is run through a filter composed of a filter cloth upon which has been placed an inert filter aid to reduce the size of the holes in the cloth and assist in the removal of the dirt and coloring matter. The liquid material is thereafter cooled to a temperature of 6° C. At such temperature the gutta-percha precipitates in the form of small flakes. The tank in which the material is contained has a false bottom covered with a gunny cloth and the liquid is allowed to run through, the gutta-percha flakes being caught on the gunny cloth. The drained solution of gasoline contains the resin and the remaining part of the coloring matter or dirt. The gasoline is eliminated therefrom by means of live steam, leaving a residue of semifluid resin. The gutta-percha flakes are then subjected to a rolling process to eliminate the water and later placed in moulds under hydraulic pressure and allowed to cool in the form of hard blocks of white gutta-percha as illustrated by exhibit 3.

The witness further testified that in Java the room temperature is 27° C., and gutta-percha remains in solution at 28° C. If gasoline at about that temperature were used as a solvent, and if time enough were allowed, the insoluble dirt remaining in suspension in the liquid after the gutta-percha had dissolved would settle. However, it would take such a long time to settle that the gutta-percha in solution would

deteriorate. When gasoline of that temperature is used the gutta-percha dissolves so slowly that it would take weeks before it would be fully in solution. Gasoline having a temperature of 6° C. would not penetrate the gutta-percha flakes and therefore the greater portion of the resins and coloring matter would remain undissolved.

The witness testified that the common yellow Tjipetir gutta-percha (exhibit 2) cannot be made into white gutta-percha such as exhibit 3 for the reason that the dirt is introduced into the yellow gutta-percha in such a finely divided state that it cannot be easily filtered and consequently would remain suspended in the cooled solution during the filtering operations and would stick to the precipitated gutta-percha. The witness was of the opinion, however, that yellow gutta-percha could be dissolved and treated by chemical means and filtered through ultra filters to form a white gutta-percha without removing the resin content, but the process would require such intensive methods that the hydrocarbons in the gutta-percha would be damaged.

A consulting and research chemist, who had specialized in rubber insulation and gutta-percha used particularly by dentists, testified for the Government that pure gutta-percha is pure white; that exhibit 2, being yellowish-brown in color, is not pure gutta-percha; and that both exhibits 2 and 3 would be forms of gutta-percha. Later, the witness, in referring to exhibit 3, stated that as it contained 98 per centum of pure precipitated gutta hydrocarbon, it was, in his opinion "a chemical product, a derivative of crude gutta-percha" and not gutta-percha. From his knowledge gained in reading chemical publications, the witness was of the opinion that gutta-percha contains from $7\frac{1}{2}$ to 45 per centum of resin. He was not familiar, however, with any gutta-percha with a resin content as low as 1 per centum. The witness was further of the opinion that the coloring matter could be removed from gutta-percha by an evaporation of the gasoline without refrigeration and that in such process the insoluble elements of dirt would have been removed by filtration and only an insignificant quantity of coloring matter would remain in the residue, which, after evaporation of the gasoline, would consist of gutta-percha and resin.

The head of a balata refining company engaged in deresinating balata for use in the manufacture of golf balls testified for the Government that it was a very simple matter to remove the dirt and impurities from gutta-percha without removing the resin content by evaporating the filtered solution before cooling. The witness admitted that he had no experience with gutta-percha derived from the leaves of the gutta-percha tree but was of the opinion that it would make no difference. He described the product represented by exhibit 2 as resin and gutta-percha, and that represented by exhibit 3 as gutta-percha. In his opinion the gutta-percha obtained from

deresinating crude balata was just the same as the gutta-percha obtained from deresinating crude gutta-percha.

At the close of the Government's case, a witness for the plaintiff testified that he had been connected with the rubber industry since 1910 and was the chief chemist of the Michelin Tire Co. and had been on the Tjipetir Estate in Java and observed the process used in obtaining the imported merchandise from the gutta-percha leaves. From his observation, he was of the opinion that all of the dirt would not dissolve in hot gasoline, but when filtered the greater part of it would be separated. He testified, however, that all of the dirt could not be so removed because gutta-percha cannot be filtered through paper filters because of the viscosity of the liquid. When using a cloth for filtering purposes, the result would be a warm solution of gutta, resin, and minor dirt, the dirt not being "in solution" but rather "in the solution." After the solution had been cooled, the portion passing through the filter would consist of the resin and the dirt that had not been removed in the first filtration as well as such of the dirt that had accumulated since. If the solution were evaporated before cooling, the residue would contain everything in the solution except the gasoline, that is, the gutta-percha, the resins, and the remaining dirt. From his observation, the second filtration was a process of separation rather than filtration because the gunny cloth used had very large holes and would catch the gutta-percha flakes but the larger portion of the dirt would pass through. Therefore the amount of dirt left after such a filtration would be small.

According to this witness, in the new method of obtaining gutta-percha free from its natural impurities, the incidental removal of the majority of the resins contained in the gutta-percha is a detriment. Because of the tendency of gutta-percha when free of the resins to oxidize and deteriorate it is necessary that it be placed in hermetically sealed cans for shipping; and that in the process used the removal of the resins was neither sought for nor desired, as they may be removed at any time by inserting gutta-percha into hot gasoline.

A Government chemist testified in behalf of the Government that analyses were made of the official sample, exhibit 2, representing yellow gutta-percha, and exhibit 3, the white gutta-percha. The results of said analyses appear in exhibit 4, as follows:

| | Official sample | Exhibit 3 | Exhibit 2 |
|---|---|---|---|
| Moisture * * * | 2. 6% | 4. 4% | 2. 1% |
| Resin * * * | 1. 6% | 1. 2% | 8. 7% |
| Ash | ——— | ——— | 0. 5% |
| Dirt * * * | 0. 3% | 0. 3% | 2. 2% |
| Gutta-percha * * * | 95. 5% | 94. 1% | 87. 0% |
| Ratio: $\dfrac{\text{Gutta-Percha}}{\text{Resin}}$ | 59. 7% | 78. 4% | 10. 0% |

This witness also analyzed the gutta-percha represented by exhibit 2 to determine whether the coloring matter therein could be removed without affecting the resin content. Certain shavings from Government illustrative exhibit A, the common yellow gutta-percha, were taken by boring holes through the exhibit with an auger and bit. A sample of these shavings or borings was admitted in evidence as illustrative exhibit B. These gutta-percha shavings were dissolved in light gasoline, filtered with activated clay and the filtrate was evaporated to remove the solvent. The result was a residue of gutta-percha free of coloring matter. A sample thereof was admitted as illustrative exhibit C. In performing the experiment the chemist used 1 ounce of gutta-percha shavings and the process required 2 hours to complete. Upon analysis he found that the resin content was the same as in illustrative exhibit A. The witness had produced by such experiment a white gutta-percha containing all of the resin found in yellow gutta-percha, and he was of the opinion that yellow gutta-percha treated in such manner would produce a white gutta-percha having the same degree of whiteness as exhibit 3, and that white gutta-percha produced in such manner would be suitable for compounding or use otherwise as a raw material. However, he could not positively so state. The witness also admitted that he was not qualified to state what would be the cost, including the equipment, of processing 5 tons a month. By the foregoing process, the witness admitted that all he accomplished was the removal of the coloring matter without changing the ratio of gutta-percha and resin. Illustrative exhibit C was further treated by the witness by dissolving such material in hot gasoline, chilling the mixture and precipitating the gutta-percha. The proportions of ingredients therein were found to be the same as in exhibit 3.

This witness further testified that the centrifuge was the only other method within his knowledge that could be used to separate the dirt from the gutta-percha; that when one centrifuges a solution very rapidly the dirt separates at the outside of the centrifuge and the solution only would remain. By cooling the solution the gutta-percha would then separate, leaving the resins in solution.

The paragraph of the free list here in question provides as follows:

PAR. 1697. India rubber and gutta-percha, crude, including jelutong or pontianak, guayule, gutta balata, and gutta siak, and scrap or refuse india rubber and gutta-percha fit only for remanufacture.

The question at issue is whether a purified gutta-percha from which the greater portion of the resins were removed in the process of removing the dirt and impurities was in such condition that it could not be considered a crude gutta-percha such as is specifically provided for in paragraph 1697.

The plaintiff argues that gutta-percha is found in white threads in the leaves of the gutta-percha tree, and that the only processing undertaken was for the purpose of obtaining the gutta-percha. No change occurred in the name, character, color, or use of the gutta-percha itself. The useful article of commerce is not the leaves, nor the resin, nor the coloring matter in the leafy fiber, but the gutta-percha alone; and that the imported article, when exposed to light and air, rapidly deteriorates to the extent of crumbling and nothing can be produced from it without the introduction of other materials and without vulcanization or curing. It is claimed, therefore, that it is nothing more than a crude article.

The Government, on the other hand, contends that the imported article is not gutta-percha, but rather a chemical derivative thereof; that the removal of the resin dedicates it to the manufacture of golf balls and renders it unfit for other purposes where a normal resin content is required; that the processes used to obtain the merchandise impart to it a name, characteristic and uses differing from the material from which it was derived, and that such manipulation is more than a mere cleansing process because the properties of the original article are changed; that the imported merchandise is in the most advanced state in which gutta-percha, as a material, is ever imported; and that in its imported condition it is used without further processing *except the mixing with it of rubber and coloring pigment, no further treatment of the gutta-percha per se being necessary*.

Counsel for the Government quotes at length from several chemical treatises concerning gutta-percha. We have examined the authorities cited by counsel and others called to our attention. We note particularly that all of the articles upon the subject of gutta-percha were published prior to the inception of the methods of extraction used in the production of the gutta-percha herein.

In Watts' Dictionary of Chemistry, Vol. II, page 658, gutta-percha is described as consisting of three hydrocarbons, to wit, gutta, 75 to 82 per centum; alban, a white resin, 14 to 19 per centum; and fluavil, a yellow resin, 4 to 6. per centum; that the gutta is obtained by exhausting gutta-percha with boiling alcohol and ether, dissolving the residue in chloroform and precipitating with alcohol; that said gutta, so derived, is a white powder, caking together and becoming transparent at 100°, beginning to melt at 150°, and becoming partly an oil at 180°.

Thorpe's Dictionary of Applied Chemistry, Vol. III, pp. 25–28, discloses that gutta-percha is extracted by mechanical processes from the leaves of the trees, but the methods of extraction involving the use of solvents have been abandoned as it was found that the chemical treatment adversely affected the durability of the gutta-

percha when exposed to the air and light. The resinous bodies "associated" with gutta are described as the oxygenated substances, albane, fluavile, and guttane. When exposed to the air gutta-percha slowly absorbs oxygen and in the process gutta is converted into a brittle resin. The hydrocarbon present in gutta-percha, known as gutta, is described as the essential constituent and exhibits in an enhanced degree the characteristic properties of the product, and the physical and mechanical properties of gutta-percha depend very largely on the proportions of gutta and resin present; that the insulation resistance thereof depends principally on the nature of the gutta and on the amount of water present and is very little affected by the removal of the resin; and that gutta-percha is employed for a variety of purposes, the chief of which are the insulation of submarine cables and the manufacture of the covers of golf balls; that when used for cable manufacture it has to be specially selected for the purpose, as the insulating power of the different commercial brands varies enormously; and that when used for golf-ball covers, the gutta-percha is hardened by the removal of the resin in order to render it as tough and elastic as possible. Some manufactures of gutta-percha were also described in said authority. When gutta-percha is dissolved in chloroform and treated with chlorine, bromine, or iodine, gutta-percha forms additional products, with some evolution of the halogen acid; and by the action of nitrogen oxides, nitrosites resembling those obtained from caoutchouc are formed.

A review of the legislative and judicial history of the crude rubber and crude gutta-percha paragraphs discloses that it has been held that refinements of rubber undertaken for the purpose of rendering an article homogeneous in texture would not take it out of the class of "crude." In the *Downing* case, G. A. 4191, T. D. 19528, refinements that fitted gutta-percha especially for use in making golf balls were held not to remove it from the classification as crude, as the processes used had not changed its commercial name or essential character. In *United States* v. *Sheldon*, 2 Ct. Cust. Appls. 485, T. D. 32245, our appellate court discussed the *Downing* case and approved the holding therein and noted that under the construction there contended for by the Government only the crudest form of this gutta-percha could be admitted free of duty. Also in the case of *United States* v. *Danker & Marston*, 2 Ct. Cust. Appls. 522, T. D. 32251, involving gum tragasol, where the Government contended that an article the result of a careful and elaborate process of manufacture, when evolved in such a complete and finished state that it was ready for use in its essential form and character without further refinement or alteration, could not be considered as "crude." In deciding adversely to the Government's contention upon that point, the court stated:

* * *. The trouble with this argument is that we are not willing to subscribe to the definition of "crude," upon which it is based. For the purposes of this case it may be conceded that things which are in a natural or a raw state, which are not processed or prepared, which are not manufactured or if manufactured not refined, are in fact generally regarded as crude articles, but from that it does not follow that no article is in a crude state which has gone beyond its natural or raw state or which has been processed, prepared, or manufactured. * * *. As applied to materials crudeness is a relative term, and to determine whether or not a thing is crude for industrial purposes some account must be taken of its intended use. However much a thing may be processed, if, as a matter of fact, it must go through some additional process of substantial preparation or manufacture in order to fit it for its chief or only use, it is, so far as that use is concerned, a crude article. * * *. That it was not the intention of Congress to put a meaning upon the term "crude" which would confine crude articles to those which were raw, unprepared, unmanufactured, or in a natural state, is evidenced by the fact that many articles clearly manufactured are enumerated as crude articles in one or both of the tariff acts here under consideration;

*       *       *       *       *       *       *

In the case of *Magee & Co. et al.* v. *United States*, 4 Ct. Cust. Appls. 443, T. D. 33874, the court construed the word "crude" when pertaining to rubber articles as follows:

We think it is clear that the purpose of Congress was, as stated, to admit free of duty rubber which was a material for the manufacture of india-rubber articles and which was nothing more. This was sufficiently provided for as to rubber in any form so long as it was crude.

And in the case of *United States* v. *Michelin Tire Co.*, 1 Ct. Cust. Appls. 518, T. D. 31544, the court held that rubber was in a crude state even though "fit for manufacture in some cases without any additional processes being applied to prepare the rubber for manufacture" so long as it had "not entered to any degree upon its course as any certain manufactured article" but remained a raw material suitable for use in the manufacture of innumerable articles.

The gutta-percha here before us is the product of a new method of extraction from its native tissue, having been invented to produce the article as free from the leafy impurities and dirt as possible. In the course of such preparation, a large portion of the resins usually found in gutta-percha in varying quantities were also removed in the process of removing the impurities. The removal of the resins was more of a detriment than an advantage because it greatly enhanced the shipping costs and adversely affected the stability of the gutta-percha so that it had to be shipped in hermetically sealed tins. True, the method of production of the gutta-percha particularly fitted the same as a material used in the manufacture of golf-ball covers, but in such state of production, it was not dedicated solely to such use, about 20 per centum of the imports into the United States being used for other purposes, and in other countries a much greater proportion. As a matter of fact, the resins are easily removed, according to the

evidence produced by both parties, without affecting the durability of the gutta-percha, whereas the methods employed to remove the impurities much more seriously affect such durability, and according to Thorpe's Dictionary of Applied Chemistry, the extraction by the use of solvents had to be abandoned for that reason.

The evidence produced by the Government that other methods may be used to extract the gutta-percha from the leaves of the gutta-percha trees in such a manner that it would be free from impurities does not carry much weight for the reason that the witnesses had no experience with extracting gutta-percha from the leaves, or with the methods employed by the shippers in this case. Nor had they other than the theoretical views relative to the final product produced by such proposed methods of extraction.

The gutta-percha here imported, according to the official analysis, contains all of the ingredients of gutta-percha, including resins. True there is from 1.2 per centum to 1.6 per centum resins rather than 8.7 per centum and only a trace of impurities, and from 94 to 95 per centum gutta-percha rather than 87 per centum, but the product is still gutta-percha and contains all the attributes thereof, and clearly is not a chemical derivative of crude gutta-percha as claimed by the Government, nor is it, in its imported condition, rendered unfit for purposes other than the manufacture of golf-ball covers, nor has it a new name, characteristics or uses that differ from those of gutta-percha. A material which is required to be mixed with rubber and coloring agents in order to be fit to be manufactured into golf-ball covers, clearly is nothing more than a material unfit for use in such manufacture without further processing.

In the case of *United States Rubber Co.* v. *United States*, T. D. 48080, certain white gutta-percha, imported from the Tjipetir Estate, Dutch East Indies, was assessed for duty as manufactures of gutta-percha under paragraph 1537. There also the importers claimed the merchandise to be free as crude gutta-percha. The court there states:

* * *. We think it perfectly apparent that all of the processes to which that which was obtained from the leaves of the gutta-percha tree was subjected were purifying processes necessary to produce a merchantable crude gutta-percha. On the record as presented it could not even be classified as an article manufactured in whole or in part under the catch-all clause in paragraph 1558, and the protests are therefore sustained, the decision of the collector being reversed.

For the reasons stated and in view of the decisions cited, we are of the opinion that the gutta-percha in question is properly entitled to free entry under paragraph 1697.

The cases cited by the Government are not applicable to the situation here presented. In *Ringk* v. *United States*, 16 Ct. Cust. Appls. 132, T. D. 42769, involving sheepskin leather cut into forms and then advanced in condition by embossing and coloring processes, the forms

were in two different sizes. The larger size, as stated by the Government, was held not entitled to free entry as leather cut into forms suitable for conversion into manufactured articles, or dutiable only as sheep leather dressed and finished, because such larger pieces had been so advanced in condition by the design and processing as to become dedicated to the manufacture of pocketbooks or handbags and commercially fit for no other use. As to the smaller forms, however, which had been similarly processed, although not entitled to free entry as claimed because after becoming leather forms they were further advanced by embossing and coloring processes, they were held dutiable as sheep leather, dressed and finished, as claimed, because such forms had not been dedicated to the manufacture of a particular kind or class of articles. Not having become fit for use for one purpose only, the court refused to hold that the smaller forms were manufactures of leather. The processing of the gutta-percha here before us has not made it unfit for any other use than that of manufacturing golf-ball covers.

The case of *Myers* v. *United States*, 1 Ct. Cust. Appls. 506, T. D. 31531, involved a paragraph of a tariff act applying to "minerals, crude, or not advanced in value or condition by refining or grinding, or by other process or manufacture * * *." The paragraph before us here is not so restricted in language.

*United States* v. *Continental Color & Chemical Co.*, 2 Ct. Cust. Appls. 165, T. D. 31679, also cited by the Government as illustrative of its contention in this case, involved articles in a crude state used in dyeing or tanning. There certain hydroxide of chrome, a precipitated substance, which had been filtered off, washed, and packed for shipment, was held to be within the definition of crude because it was only a raw material which was to be converted by further treatment into other articles fit for such use, and that the fact it was necessary to be so converted was "the important aspect in which the article may be said to be in a crude state." The foregoing case sustains the plaintiff's viewpoint rather than that of the Government, inasmuch as the gutta-percha here imported, before being used in the manufacture of golf-ball covers is required to be mixed with the proper quantity of rubber and coloring agents.

The white gutta-percha here imported, even though 80 per centum thereof is used in the golf-ball industry, cannot be said to be of such nature that it is spoiled for any other use, and in our opinion is merely a crude raw material, and for the reasons heretofore stated it is held properly entitled to free entry as gutta-percha, crude, under the provisions of paragraph 1697, as claimed.

Judgment will therefore be entered in favor of the plaintiff directing the collector to reliquidate the entry and make refund of all duty taken.