UNITED STATES *v.* UNITED STATES RUBBER CO. (No. 4456)[1]

[1] C. A. D. 269.

United States Court of Customs and Patent Appeals, February 7, 1944

*Paul P. Rao*, Assistant Attorney General (*Joseph F. Donohue*, special attorney, of counsel) for the United States.

*Arthur, Dry & Dole* (*H. Plitt Sadtler, Jr.*, of counsel) for appellee.

[Oral argument December 9, 1943, by Mr. Donohue and Mr. Sadtler]

Before GARRETT, Presiding Judge, and BLAND, HATFIELD, LENROOT, and JACKSON, Associate Judges

LENROOT, Judge, delivered the opinion of the court:

This appeal brings before us for review a judgment of the United States Customs Court, Third Division, which sustained appellee's protest against the classification by the collector at the port of New York of certain merchandise described as "White Gutta-Percha," imported from the Netherlands East Indies. It was classified by the collector under the provisions of paragraph 1558 of the Tariff Act of 1930, and assessed with duty at the rate of 20 per centum ad valorem. The protest claimed that the merchandise is entitled to free entry as crude gutta-percha under the provisions of paragraph 1697 of said act, and this claim was sustained by the trial court.

The involved tariff provisions read as follows:

PAR. 1558. That there shall be levied, collected, and paid on the importation of all raw or unmanufactured articles not enumerated or provided for, a duty of 10

per centum ad valorem, and on all articles manufactured, in whole or in part, not specially provided for, a duty of 20 per centum ad valorem.

PAR. 1697. India rubber and gutta-percha, crude, including jelutong or pontianak, guayule, gutta balata, and gutta siak, and scrap or refuse india rubber and gutta-percha fit only for remanufacture.

Both parties took testimony.

The principal witness in behalf of appellee was Dr. H. R. Braak, chief advisor of the "Netherlands East Indies Government plantations," the producer of the involved merchandise. His testimony relative to the process of producing the same is summarized in the decision of the trial court as follows:

Doctor H. R. Braak, chief advisor and superintendent of the Netherlands East Indies Government plantations and of the Tjipetir Estate, testified substantially as follows: Gutta-percha is a vegetable material obtained from the juice of the gutta-percha tree; that formerly in order to obtain the juice the trees were cut down and destroyed; and that on account of the widespread destruction of the trees the Netherlands East Indies Government established an estate where gutta-percha was obtained from the leaves of the trees rather than from the trunk. In processing, the leaves were ground into a pulp and the mass boiled in water. By agitating the boiling mass the fine gutta-percha threads meet and stick together and form so-called gutta-percha flakes which are "intensely mixed with the leaf matter," called dirt. The mass of material is diluted and cooled, the gutta-percha flakes coming to the surface are skimmed off, warmed, and pressed into slab shape. Such process results in the yellow Tjipetir gutta-percha, as represented by exhibit 2 in evidence.

The witness further testified that after the year 1926 the insulating material developed from the yellow gutta-percha was found to be inadequate for submarine cables. The company then started experiments to develop a method of extracting gutta-percha from its native condition, which would permit a lesser quantity of dirt than contained in exhibit 2 in order to improve the insulating qualities of the product. Subsequent to 1928 the witness had developed the method, as set out below, used in obtaining a gutta-percha free from dirt, as illustrated by exhibit 3, the white gutta-percha imported herein.

The witness described the method of producing the instant merchandise substantially as follows: After the foregoing leafy mass had cooled and the gutta-percha flakes were skimmed off, approximately 2½ per centum of the vegetable matter and dirt still remained in the flakes. In order to remove as much as possible of such material from the gutta-percha, the flakes are placed in a cutting machine to reduce them in size and afterwards placed in a tank of hot gasoline where the gutta-percha dissolves. After allowing the mixture to settle, it is run through a filter composed of a filter cloth upon which has been placed an inert filter aid to reduce the size of the holes in the cloth and assist in the removal of the dirt and coloring matter. The liquid material is thereafter cooled to a temperature of 6° C. At such temperature the gutta-percha precipitates in the form of small flakes. The tank in which the material is contained has a false bottom covered with a gunny cloth and the liquid is allowed to run through, the gutta-percha flakes being caught on the gunny cloth. The drained solution of gasoline contains the resin and the remaining part of the coloring matter or dirt. The gasoline is eliminated therefrom by means of live steam, leaving a residue of semifluid resin. The gutta-percha flakes are then subjected to a rolling process to eliminate the water and later placed in moulds under hydraulic pressure and allowed to cool in the form of hard blocks of white gutta-percha as illustrated by exhibit 3.

The witness further testified that in Java the room temperature is 27° C., and gutta-percha remains in solution at 28° C. If gasoline at about that temperature were used as a solvent, and if time enough were allowed, the insoluble dirt remaining in suspension in the liquid after the gutta-percha had dissolved would settle. However, it would take such a long time to settle that the gutta-percha in solution would deteriorate. When gasoline of that temperture is used the gutta-percha dissolves so slowly that it would take weeks before it would be fully in solution. Gasoline having a temperature of 6° C. would not penetrate the gutta-percha flakes and therefore the greater portion of the resins and coloring matter would remain undissolved.

The witness testified that the common yellow Tjipetir gutta-percha (exhibit 2) cannot be made into white gutta-percha such as exhibit 3 for the reason that the dirt is introduced into the yellow gutta-percha in such a finely divided state that it cannot be easily filtered and consequently would remain suspended in the cooled solution during the filtering operations and would stick to the precipitated gutta-percha. The witness was of the opinion, however, that yellow gutta-percha could be dissolved and treated by chemical means and filtered through ultra filters to form a white gutta-percha without removing the resin content, but the process would require such intensive methods that the hydrocarbons in the gutta-percha would be damaged.

With respect to the resin content of the involved merchandise by exhibit 3, the witness testified as follows:

Q. You state that there is about 7½ percent resin in the gutta-percha in plaintiff's exhibit 2 for identification?—A. Yes.

Q. How much is there in exhibit 3 for identification?— A. In exhibit 3 for identification there is approximately 1 percent of resin.

Q. Will you explain where the resin goes?— A. After we have the floated flakes, put them in gasoline, settled, filtered, the resin content is not changed, but when that solution is cooled we remove unintentionally part of those resins, because they remain in solution while the gutta-percha is precipitated. Moreover, I would like to say that we have regretted that this happens, because it is due to this fact, this removal of resins unintentionally, that this exhibit 3 for identification is very much liable to oxidation, and this as a matter of fact was a very undesirable situation which hindered the introduction of this material, because we did not know any way for shipping it. Later we found that we had to ship this exhibit 3 for identification in vacuum tins. That is a very expensive method.

Q. What benefit would you derive from leaving the resin in if you could?— A. It would be more stable. It would not deteriorate so easily. It would not oxidize so easily, because the resins act as protectors against oxidation. Saying it in another way, we would rather have preferred to make a material which has only got rid of the dirt, with the resin still in it, but we could simply not do it.

    *       *       *       *       *       *       *

Q. Now, my understanding of what you said is that plaintiff's exhibit 2 for identification is the same thing as exhibit 3 for identification, minus a certain percentage of dirt and resin?—A. That is correct.

Q. Removed by the process that you have described?—A. Correct.

With respect to the use of the involved merchandise, the witness testified as follows:

Q. Will you say what uses you know of are made of exhibit 3 for identification white gutta-percha, in this country?—A. Exhibit 3 for identification is used in this country for golf balls mainly, but it is also used for belts, driving belts. Only in that case it is not necessary to remove so much of the dirt. That is why we

distinguish a special grade for that purpose of gutta-percha, so-called white gutta second grade, but it is essentially the same material, the only difference being that we are less careful in our filtration, which involves that a very small amount of dirt is still contained in it.

*     *     *     *     *     *     *

Q. Now, Dr. Braak, you have been around to factories in this country. What do they do with this material when they use it?—A. If we take for example the golf-ball industry—When the golf-ball industry receives the material and wants to make golf-ball coverings out of it, they have to take the gutta-percha and mix it with various materials, zinc oxide, titanium oxide, sulphur, and to cure it, vulcanize it in most cases. Then accelerators are mixed in, and various other minor ingredients. It is never used as such; always mixed with certain ingredients. This is also true for other applications. For instance in the belt industry it is mixed with rubber and filling material, cured, and sometimes not cured. In the submarine cable industry, where experiments have been made in this country, it is also mixed with raw materials, with carbon black, etc.

*     *     *     *     *     *     *

X Q. And exhibit 2 was formerly used in the manufacture of submarine cables?—A. Yes, and they are still used now for replacing parts of old cables. We still deliver some of it because there are still some of the old cables which have to be repaired.

X Q. What is there about exhibit 2 that made it objectionable in the use of cables after 1926?—A. The dirt content.

X Q. And that dirt content was satisfactory before that time, but not satisfactory after?—A. That is right, because in the old days the submarine cable industry was only making telegraph cables, while in order to compete with the wireless they had to switch over to long-distance high-frequency telephone cables, which required on account of the high frequency a much better insulating material, and it was proved that this small amount of dirt, 2½ percent, had a very bad electrical influence.

X Q. When you speak of the dirt in exhibit 2 that made it objectionable, you do not include the natural resin content?—A. No; I only mean the fiber and the coloring material.

X Q. Nor is the resin in itself as naturally found in gutta-percha objectionable for use in wireless, is that right?—A. You mean in cable which competes with wireless?

X Q. Yes.—A. As a matter of fact, the cable industry likes to have a resin content of about 3 percent, a little bit less than in the ordinary grade, but the resin content is not so important to them as the dirt content. It is particularly against the dirt content they are opposed against.

X Q. Now, have you any information as to the properties of gutta-percha that are required in the manufacture of golf balls? Have you made a study of those properties?—A. Yes; certainly.

X Q. And is the resin content in exhibit 2, is that objectionable in the use for the manufacture of golf balls?—A. It probably is. What I know is that the specifications for the material for the golf-ball industry is dependent upon the manufacturer, that it is no more than about 2 or 2½ percent.

X Q. Are you quite certain on that percent?—A. Yes.

X Q. Is 2½ percent permissible?—A. 2 to 2½ percent.

X Q. Is the dirt content of exhibit 2 objectionable in the use of golf balls?—A. Yes; it is.

X Q. Exhibit 3 therefore is ideal for use in the manufacture of golf balls, is it not?—A. It is fully ideal.

X Q. It is not ideal for the use in the manufacture of submarine cables?—A. That is right.

X Q. Do you have any information on the relative percent of exhibit 3 that is used in the manufacture of cables, and in the manufacture of golf balls?—A. At this moment, in this country, at least 80 percent is used in the golf-ball industry, and about 20 percent used for other purposes, approximate figures.

X Q. For all other purposes?—A. Yes, sir.

One Sherman I. Strickhouser, a witness on behalf of appellee, testified that he was manager of the development department of appellee, and described the manner in which the involved material was used in the manufacture of golf balls as follows:

The material is received, as I have said, in vacuum tins. It is examined superficially for quality and samples taken for analysis. The material is then placed on a rubber mill, along with other crude materials; a certain percent of crude rubber, for instance, pigments, reinforcing agents, vulcanizing agents, and accelerators. The whole thing is blended into a homogeneous mass, taken off the mill in roughly small, square biscuits, which are later pressed by small hydraulic pressure into hemispheres about the size of a finished golf ball. Two of these hemispheres are then placed around the mound core of a golf ball, put into a mold which is situated in a hydraulic press. The mold is closed, and a certain temperature cycle is gone through wherein heat and cold are alternately employed. This molding serves to press the gutta-percha and rubber cover into the thread winding and to also impart to the outside of the cover the characteristic markings of a golf ball.

A chemical analysis of an official sample of the involved merchandise of exhibits 2 and 3 was introduced in evidence by the Government, which analysis reads as follows:

EXHIBIT NO. 4

AMENDED LABORATORY REPORT

U. S. CUSTOMS LABORATORY

NEW YORK, N. Y., *9/20/41.*

Sample of white Gutta Percha & Tjipetir.   Received 8/28/41.

Submitted by Asst. Atty. Gen'l Paul P. Rao, Esq., U. S. Customs Court. Port New York, N. Y.

Entry No. 729718 and Protest #61165–K.   Marks E–9290, exhibits 2 and 3.

Importer _____ Maker _____ Origin _____
Required Analysis?
Other data _____

AMENDED REPORT

The samples have the following analysis:

|  | Official | Exhibit 3 | Exhibit 2 |
|---|---|---|---|
| Moisture (In vacuo, 95° C.) | 2. 6% | 4. 4% | 2. 1% |
| Resin (Acetone Extract, 10 hrs.) | 1. 6% | 1. 2% | 8. 7% |
| Ash | _____ | _____ | 0. 5% |
| Dirt (Insoluble in Xylol Extract, 10 hrs.) | 0. 3% | 0. 3% | 2. 2% |
| Gutta-Percha (Calculated) | 95. 5% | 94. 1% | 87. 0% |
| Ratio: $\dfrac{\text{Gutta-Percha}}{\text{Resin}}$ | 59. 7% | 78. 4% | 10. 0% |

L. B. McSORLEY,

J. GROSS,

J. Gross.

L. B. McSorley,

*Chief Chemist*

Joseph V. Sample, a Government chemist, testified that he had made certain tests of gutta-percha represented by exhibit 2 and found that the coloring matter could be removed without removing the resin content thereof.

One Dr. Poetschke, a witness in behalf of appellant, testified that he was a chemist specializing in rubber and gutta-percha materials. He further testified, in part, as follows:

Q. What is crude gutta-percha?—A. Crude gutta-percha is the concrete juice obtained from certain saponaceous plants. That is a concrete juice as distinguished from a fluid.

\* \* \* \* \* \* \*

Q. Based upon the chemist's report which you have there, and the physical appearance of exhibits 2 and 3, state wherein exhibit 3 differs from exhibit 2.—A. Exhibit 3 is practically pure white material. Pure gutta-percha is pure white. Exhibit 2 is yellowish-brown in color, which clearly indicates that it is not pure gutta-percha. It has impurities in it. Now the question is that all crude gutta-percha contains besides indefinite amounts of moisture, certain amounts of insoluble matter which may be mineral matter, dirt, or coloring matter that is insoluble. It contains resins, and it contains the pure gutta hydrocarbon. Now, this material in its color, its appearance, compared to this—

Q. Exhibit 2 compared to exhibit 3?—A. Yes; indicates clearly that there are impurities in it, exhibit 2. Now it would require of course a chemical analysis to determine what the nature of these impurities may be. You can't determine that by just looking at the sample. I can merely tell you what the color and appearance is, but it lacks the purity that this sample has here, exhibit 3.

Judge KEEFE. Is it still gutta-percha?

The WITNESS. These both would be forms of gutta-percha, certainly. You can tell that from the toughness and appearance.

\* \* \* \* \* \* \*

Q. State whether or not, in your opinion, exhibit 3 is gutta-percha as you have defined it.—A. No; I would say that is a chemical product, a derivative of crude gutta-percha.

\* \* \* \* \* \* \*

X Q. You have read Dr. Braak's testimony about this process of extraction of the dirt?—Dr. Braak says that in the process he used on the Tjipetir plantation, they would like to keep the resin in, but it comes out. Will you explain to us at what point in their process they could avoid removing the resin?—A. They couldn't avoid removing the resin if they want to produce this material.

X Q. That isn't the point. Dr. Braak's testimony says that their process is to remove the dirt, and chlorophyl, or coloring matter, and that they are not particularly interested in taking out any substantial part of the resin, but that with the process they use, that the resin is driven into solution, and in the cold gasoline solution it doesn't coagulate with the hydrocarbon element and passes off in the filter. I want you to tell me—because you said it isn't necessary to take out the resin in order to remove the dirt—I want you to tell me at what point in Dr. Braak's process they can avoid removing the resin, because I think Dr. Braak would like to know.—A. That is his process, and if he is going to conduct the process that way, he can't avoid removing the resin.

We do not deem it necessary to further set forth the evidence in the case. We are of the opinion therefrom that the trial court was

warranted in holding that the removal of most of the resin in the process of producing the involved merchandise was incidental to the removal of the dirt, and unavoidable; that there was no object in removing the resin, but that such removal was a detriment to the producer and caused such difficulties in transportation that it was necessary to transport it in vacuum-sealed tins, and that the removal of resin from gutta-percha can be easily accomplished in this country.

We are further of the opinion that merchandise like that here involved is, in the condition imported, merely material for use, after further processing, in the manufacture of various products, chiefly golf balls.

The Government relies very largely upon quotations from scientific publications giving percentages of resin contained in crude gutta-percha, which percentages are much higher than the percentage of resin contained in the involved merchandise.

Most of these publications, however, were issued long before the process employed in producing the involved merchandise was known. In fact, some of them state that while gutta-percha may be produced from the leaves of the gutta-percha tree, the process is not commercially practicable. Hence, we can give little weight to the scientific publications relied upon by the Government.

This court has many times had occasion to consider the meaning of the term "crude" as used in tariff statutes.

In the case of *Fynaut & Popek* v. *United States*, 23 C. C. P. A. (Customs) 265, T. D. 48112, we reviewed a number of our decisions upon this question, and said:

It would appear from the decided cases that the meaning of the word "crude" has been somewhat enlarged from its common meaning as found in standard dictionaries, but we have found no case where the word has been given a *narrower* meaning than its ordinary common meaning. We find nothing in said paragraph 776 to lead us to conclude that Congress intended, in its enactment, that articles named therein, when in their natural state, should not be considered to be crude.

In the case of *Togasaki & Co. et al.* v. *United States*, 12 Ct. Cust. Appls. 463, T. D. 40667, the court said:

The word "crude," has been defined so many times by the courts as to require but little citation of authority here. It has been held to mean, when applied to the name of anything, that this thing, however much it may be processed, if, as a matter of fact, it must go through some additional process of substantial preparation or manufacture in order to fit it for its chief or only use, is, so far as that use is concerned, a crude article.—United States v. Danker & Marston (2 Ct. Cust. Appls. 522 [524]; T. D. 32251); United States v. American Chicle Co. (10 Ct. Cust. Appls. 98; T. D. 38360); United States v. Rice Co. (9 Ct. Cust. Appls. 165; T. D. 37998). * * *.

In the case of *Magee & Co. et al.* v. *United States*, 4 Ct. Cust. Appls. 443, T. D. 33874, there was involved the classification of scraps of new rubber, under paragraph 591 of the tariff act of 1909, which

provided for the free entry of "india rubber, crude * * *." The opinion states:

We think it is clear that the purpose of Congress was, as stated, to admit free of duty rubber which was a material for the manufacture of india-rubber articles and which was nothing more. This was sufficiently provided for as to rubber in any form so long as it was crude.

In *United States* v. *Sheldon & Co.*, 2 Ct. Cust. Appls. 485, T. D. 32245, the court said:

The word "crude" as used in tariff laws has by construction and a long and consistent line of decisions been given a meaning somewhat variant from its common and accepted meaning, the frequent reenactment of the term in the statute having been tantamount to a confirmation thereof. What constitutes a refining or advance in condition from the crude state of the article has, likewise, been the subject of judicial and legislative construction, and it is not every manipulation, though it may add something to the value or condition of the article, which may be held to bring it within such language of the statute. Its presence in a tariff act requires that it be construed with a thought to its apposite conditions provided in the act, to wit, manufactured or a condition of substantial advancement by processing.

The Government contends that the merchandise produced by appellee's process acquired a new name, "gutta," and a new use. We find nothing in the record to support this contention. It was invoiced as "White Gutta-Percha," and there is no evidence that such merchandise is ever bought and sold under any other name.

Neither is the involved material applied to a new use.

In the Summary of Tariff Information, 1929, pages 2387 and 2388, we find the following:

Gutta-percha is the product obtained by coagulating the latex of certain species of trees (*Palaquium* and *Payena*) native to the Malay Peninsula and Archipelago. It is a grayish white substance possessing great suppleness, but little elasticity. In many of its physical properties gutta-percha resembles india rubber and in use is often mixed with it. When vulcanized with sulphur it forms a very hard substance. It is used chiefly as an insulator for underground electrical wiring; in golf balls; temporary fillings for teeth; driving belts; rings, valves, and washers for pumps and hydraulic presses; boot soles; acid cements; tissue for mending clothing and for surgical work; and also for other minor purposes. Gutta balata and gutta siak are similar to gutta-percha in physical properties and in use.

\*          \*          \*          \*          \*          \*          \*

Gutta-percha, siak, and balata latex, is obtained from the trees by making incisions in the bark. It coagulates on exposure to the air, and is purified by washing. It is also extracted by mechanical processes from the leaves and twigs, but this product is of inferior quality. * * *.

Also, in the case of *United States* v. *Sheldon & Co.*, *supra*, it appears that gutta-percha was used in the manufacture of golf balls prior to 1912.

In view of all the foregoing, we are of the opinion that the trial court came to the right conclusion. To hold otherwise would, ac-

cording to the record, prevent a holding that *any* gutta-percha free from dirt produced commercially under any known process from the leaves of gutta-percha trees, is crude gutta-percha.

The mere fact that in the process of removing the dirt most of the resin was also removed, making it unnecessary to remove it after importation for the manufacture of golf balls, does not, in our opinion, in view of the authorities hereinbefore cited, affect its character as crude gutta-percha.

For the reasons stated herein, the judgment appealed from is *affirmed.*